**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF UNITED LATIN AMERICAN CITIZENS
1150 18th Street NW, Suite 650
Washington, DC 20036

COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005

COMMON CAUSE EDUCATION FUND
805 15th Street NW, Suite 800
Washington, DC 20005

UNIDOSUS
1126 16th Street NW, Suite 600
Washington, DC 20036

CITY AND COUNTY OF DENVER, COLORADO
201 West Colfax Avenue, Dept. 1011
Denver, CO 80202

*Plaintiffs*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane SW
Washington, DC 20528

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
245 Murray Lane SW
Washington, DC 20528

Case No. 26-cv-(XXXX)

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, DC 20536

DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536

*Defendants*.

**PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In the final months of the Civil War, Congress, in order to preserve free and fair elections in the dearly defended union, enacted a law prohibiting federal officials, on penalty of fine and imprisonment, from ordering or placing "any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States."[1]

2. Congress was concerned about executive overreach, and the risk that the federal executive would use armed force to interfere in state and federal elections.[2]

[1] Act of February 25, 1865, Pub. L. No. 38-52, ch. LII, 13 Stat. 437, codified as amended at 18 U.S.C. § 592.

[2] Chris Mirasola, *Domestic Military Deployments After Trump v. United States*, 67 Wm. & Mary L. Rev. 189, 204–205 (2025).

3. Since that time, the executive branch has generally respected and obeyed this prohibition. For example, the Department of Justice's election-law enforcement manual, followed for the past four decades, states that this provision "makes it a felony for any federal official to send 'armed men' to the vicinity of open polling places."[3]

4. But in the lead-up to the 2026 midterm election, officials in the Trump-Vance administration have spoken openly about sending armed federal agents to polling places.

5. On September 1, 2026, Secretary of Homeland Security Markwayne Mullin confirmed and clarified the administration's policy of authorizing armed Immigration and Customs Enforcement officers to go to polling places—not to repel armed enemies of the United States, but to conduct civil immigration and customs enforcement operations, including serving warrants and detaining individuals suspected of being unlawfully present in the United States (the "Polling Place Policy").

6. This articulation of federal policy follows on the heels of months of comments, guidance changes, and law enforcement activities that make clear that the administration has unlawfully claimed for itself the purported authority to send armed federal officers to polling places over the course of the 2026 midterm election.

7. Defendants Mullin, the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), and Acting ICE Director David Venturella (together, "DHS Defendants") have adopted and are implementing the Polling Place Policy. DHS Defendants' adoption of the Polling Place Policy violates the express criminal prohibition of 18 U.S.C. § 592.

---

[3] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 9 (8th ed. 2017), https://perma.cc/NU6K-R72C; Craig C. Donsanto & Nancy L. Simmons, *Federal Prosecution of Election Offenses* 10 (7th ed. 2007), https://perma.cc/K59Z-7CDX.

8. The specter of armed officers at polling places threatens the freedom of this upcoming election. It places voters in fear that they will be confronted by armed federal immigration enforcement officers if they choose to cast a ballot.

9. U.S. citizens may reasonably fear interactions with ICE. According to available reporting, in recent years, ICE has unlawfully detained more than 170 U.S. citizens.[4] American citizens peacefully exercising their First Amendment rights have been shot and killed by ICE.[5] And ICE agents frequently stop and question citizens—sometimes detaining them for days—based on racial profiling.[6]

10. The presence of federal force at the polls interferes with the smooth administration of elections at the local level. It disrupts voting and makes it more difficult for state and local election officials and law enforcement to do their jobs by making polling places spaces of confrontation.

11. Congress banned armed federal agents at election sites to provide and preserve free and fair elections, the rule of law, the right to vote, and Americans' confidence in the sanctity of the ballot box. Defendants' disregard for that statutory framework threatens our upcoming election. Judicial review of the Polling Place Policy is appropriate now to declare that, except as narrowly provided by law under 18 U.S.C. § 592, the federal government may not send armed officers to

---

[4] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM; *see also Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025) (finding ICE agents had, in multiple instances, detained U.S. citizens by force, and in one instance, taking their Real ID and leaving them vulnerable to the next ICE agent to profile them).

[5] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

[6] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

polling sites, as that would violate the prohibition on federal "armed men" at election sites and interfere with the conduct of a free and fair election. Defendants should not be permitted to cast the pall of federal force over the ballot box as we head to the polls in the coming days.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. § 701, *et seq*.

13. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies of the United States and officers or employees of those federal agencies who are sued in their official capacity. Further, at least one Defendant is headquartered in the District of Columbia, where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

### LULAC

14. Plaintiff League of United Latin American Citizens ("LULAC") is a nationwide, non-profit, non-partisan, membership-based organization with 359 councils (chapters) and 896,972 members nationwide. LULAC was established in 1929 and is headquartered in Washington, D.C.

15. LULAC is the largest and oldest Latino civil rights membership and advocacy organization in the United States. Its mission is to improve the lives of Latino families throughout the United States and to protect their civil rights through community-based programs in each of its 359 councils.

16. LULAC's members include both U.S. born citizens and naturalized citizens. Its members are civically engaged: approximately 83% are registered to vote, nearly 76% of

LULAC's registered members voted in 2020, and around 62% voted in 2022, exceeding the voting rates of the general population.

17. Throughout the year, LULAC's members, working through its councils, register prospective voters and hold voter registration drives at naturalization ceremonies, schools, churches, and other community events. At these events, LULAC members, working through its councils, often, at the request of registrants, collect voter registration forms and return them to local election offices in accordance with state law. LULAC holds get-out-the-vote programs before elections to encourage its members to vote.

**Common Cause**

18. Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia with a mission to uphold the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process. Common Cause has nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. It has members in every congressional district. Since John Gardner, a Republican and cabinet secretary in the Johnson administration, founded it more than fifty-five years ago, Common Cause has worked to make government at all levels more representative, open, and responsive to the interests of everyday people.

19. Plaintiff Common Cause Education Fund (the "Education Fund") was formed in 2000 as a nonprofit under the laws of the State of Delaware. The Education Fund provides education, engagement, and research to Common Cause members, constituents, partner organizations, and the public about voter registration and the electoral process. The Education

Fund works to create public engagement on democracy issues and to promote effective citizen participation, which is critical for a healthy and robust democratic society.

20. Common Cause and the Common Cause Education Fund (together, "Common Cause") bring this action jointly and on behalf of its members. Common Cause mobilizes voters to participate in the electoral process. It runs programs that assist and protect them when they do, because voters' free and fair ability to cast a ballot is essential to self-government and to deciding the country's future.

21. A member of Common Cause is any individual who, within the preceding twenty-four months, has either made a financial contribution to Common Cause or the Common Cause Education Fund, or taken meaningful action with Common Cause or the Common Cause Education Fund in furtherance of the organizations' mission, including signing a petition, contacting an elected official through Common Cause platforms, registering to vote through Common Cause programs, volunteering, participating in a training or organizing event, or otherwise engaging in advocacy actions organized by Common Cause or the Common Cause Education Fund.

22. Common Cause's members include registered voters in every state and the District of Columbia, U.S.-born citizens, naturalized citizens, citizens in mixed-status families, and people who serve as poll monitors, poll workers, interpreters, voter registration volunteers, and drivers who take voters to the polls, through the Election Protection program.

**UnidosUS**

23. Plaintiff UnidosUS is a nonprofit, nonpartisan organization headquartered in Washington, D.C.

24. UnidosUS is the nation's largest Hispanic civil rights and advocacy organization with more than 300 affiliates nationwide. Its mission is to build a stronger America by creating

opportunities for Latinos. Through advocacy, research, and a network of nearly 300 community-based Affiliates across all fifty states, the District of Columbia, and Puerto Rico, UnidosUS works to expand economic opportunity, strengthen civic participation, and promote the social and political advancement of Latino communities. Since 1968, UnidosUS has challenged barriers that limit the ability of Latinos to fully participate in American civic and economic life.

25. Among its core activities, UnidosUS has for many years conducted nonpartisan voter outreach to encourage eligible Latino citizens to register and to prepare to vote. In the 2026 election cycle, as part of get-out-the-vote activities, UnidosUS anticipates that its staff and nationwide network of volunteers will contact approximately 300,000 registered Latino voters through in-person, telephonic, and digital means. This voter outreach program provides eligible Latino voters information about registration, checking their registration status, and making a plan to vote, including providing details about polling locations and hours of operations, identification requirements, and what to expect when voting. The purpose of that outreach is to ensure eligible Hispanics are registered and prepared to cast a ballot.

**City and County of Denver, Colorado**

26. Plaintiff City and County of Denver ("Denver") is a home rule municipality organized and existing under the laws of the State of Colorado. It is the capital city of Colorado and the largest city in the state, with a population of 715,522 according to 2020 census data.

27. The Denver Clerk and Recorder is an independently elected official for Denver. Under Denver's charter and the state's Uniform Election Code, the Clerk and Recorder is the designated election official for Denver and is responsible for administering elections. The Clerk and Recorder manages voter registration for the county in the state voter registration database, plans and coordinates local, state, and federal elections, prepares, certifies, and distributes ballots,

manages 24-hour drop boxes and Voter Service and Polling Centers across the city and county, educates the public on voting procedures and practices, and tabulates and certifies election results.

**Defendants**

28. Defendant U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

29. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

30. Defendant U.S. Immigrations and Customs Enforcement is a federal enforcement agency housed under Defendant DHS and headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

31. Defendant David Venturella is the acting director of U.S. Immigration and Customs Enforcement and is sued in his official capacity.

## LEGAL FRAMEWORK

32. 18 U.S.C. § 592 provides:

> Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

33. This provision reflects congressional concern about the corrosive effect of involving armed federal officers in elections—on both the integrity of our elections and the political neutrality of the military and law enforcement.

34. The bill's sponsor stated that its primary object was to protect "the freedom of the elective franchise," prescribing "punishments for certain persons engaged in the public service who shall in any way interfere with the freedom of election." Cong. Globe, 38th Cong., Sess. 1, Vol. 1, at 101 (Jan. 6, 1864) (statement of Sen. Powell), https://perma.cc/D2B2-7ZUV.

35. As originally enacted, the statute contained *two* exceptions, prohibiting troops or "armed men" at polling places "unless it shall be necessary to repel the armed enemies of the United States, or to keep the peace at the polls." Pub. L. No. 38-52, ch. LII, 13 Stat. 437 (1865). However, in 1909, Congress specifically *repealed* the exception allowing federal troops or "armed men" to "keep the peace at the polls." Pub. L. No. 350, ch. 321, 35 Stat. 1088, 1092–93 (1909). Other than recodification and technical amendments, the statute has stood in its present form since then. Congress thus specifically excised federal officers' authority to "keep the peace," and squarely limited it to repelling armed enemies.

36. The Administrative Procedure Act ("APA") holds executive agencies accountable to the rule of law and gives Americans redress when federal agencies take action or make policy that is arbitrary or capricious or contrary to law. 5 U.S.C. § 702, *et seq.*

37. Shortly after the conclusion of World War II and to account for the expanded powers granted to the executive branch under the New Deal, Congress passed the APA, which prohibits federal agencies from taking action that is "arbitrary, capricious, an abuse of discretion, . . . contrary to constitutional right, power, privilege, or immunity . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . without observance of procedure required by law . . . unsupported by substantial evidence . . . [or] unwarranted by the facts." 5 U.S.C. § 706(2).

38. The Act gives federal courts the power to hold agencies in check when they make unreasoned, unreasonable, or unlawful decisions: when agencies take such action, it must be held "unlawful and set aside." *Id.*

39. The Act's careful balance of executive power with democratic accountability was the result of ten years of deliberation and was considered to be a reflection of the "the nation's decision to permit extensive government, but to avoid dictatorship and central planning."[7]

## FACTUAL ALLEGATIONS

### I. Defendant Mullin clarifies DHS's policy of ICE officers at the polls.

40. All American States and territories will conduct a federal midterm election over the next two months, and many will also hold state or local elections. The election begins in some states with early voting as soon as September 18 and culminates in Election Day on November 3, 2026.

41. On September 1, 2026, Defendant Mullin stated that the Department of Homeland Security authorizes ICE officers to go to polling places under the Polling Place Policy. He indicated that ICE agents have authority to go to polling sites for two distinct purposes:

> The only reason why we would be at polling places is if there is a threat to that polling place or we're serving a warrant on someone that we have been actively tracking down. . . . ICE's job is immigration, customs enforcement. That's their job . . . if we're serving a warrant we will be where we need to be.[8]

42. When ICE agents respond to threats or execute federal warrants, they are armed within the meaning of 18 U.S.C. § 592.

43. When asked for more clarity on Mullin's comments, DHS said in a statement that:

---

[7] George B. Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 Nw. U. L. Rev. 1557, 1559 (1996).

[8] Eric Bazail-Eimil, *Mullin says DHS could deploy to polling sites for 'specific' threats, arrests*, POLITICO (Sep. 1, 2026), https://perma.cc/N2VN-HCYJ.

> ICE conducts intelligence-driven targeted enforcement, and if an active public safety threat endangered a polling location, they may be arrested as a result of that targeted enforcement action.[9]

44. DHS Defendants have thus confirmed their adoption of a policy of authorizing armed ICE officers to go to polling places to police "threats" and to conduct routine immigration and customs enforcement.

45. DHS Defendants did not engage in a rational or reasoned process before enacting and announcing the Polling Place Policy. There is no indication that DHS Defendants considered any evidence or testimony regarding the effect of authorizing armed officers to enter polling places on the integrity of our elections, states' ability to conduct them in a free and fair manner, or voters' fears about being confronted by federal force at the polls.

46. DHS Defendants' failure to engage in reasoned decision making and disregard for existing federal law taints the Polling Place Policy.

## II. The Trump-Vance administration has been preparing and acting on the Polling Place Policy for months.

47. Under the Constitution, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4. Thus, the States, "as recognized administrator[s] of elections," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), are "invest[ed] . . . with responsibility for the mechanics of congressional elections"—so long "as Congress declines to pre-empt state legislative choices." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted).

48. But over the past year, the Trump-Vance administration and DHS Defendants have made clear through public statements and civil immigration enforcement activity that they have

---

[9] *Id.*

adopted a policy that authorizes armed federal law enforcement officers to go to polling places in violation of federal law and to interfere with state election administration in the process.

49. The administration developed and began implementing the Polling Place Policy over the past several months, while simultaneously disclaiming the existence of any such policy. But Defendant Mullin's comments confirm what was apparent from DHS Defendants' actions.

50. On February 3, 2026, former Trump advisor and chief strategist Steve Bannon, in response to statements by President Trump that "Republicans ought to nationalize the voting," said, "We're going to have ICE surround the polls come November. We're not going to sit here and allow you to steal the country again. . . . President Trump has to nationalize the election."[10]

51. On February 5, 2026, when asked whether ICE agents would be sent to polling locations, White House Press Secretary Karoline Leavitt said that she "can't guarantee that an ICE agent won't be around a polling location in November."[11]

52. In March 2026, then-Deputy Attorney General Todd Blanche made clear that the Trump-Vance administration would disregard federal law prohibiting armed federal agents from entering polling places when, in comments to the Conservative Political Action Conference, he stated, "Why is there objection to sending ICE officers to polling places?"[12]

---

[10] Jacob Wendler, *Steve Bannon calls for Trump to deploy ICE and military troops to polling sites*, POLITICO (Feb. 4, 2026), https://perma.cc/E2UV-VUTH (internal quotation marks omitted).

[11] Andrew Feinberg, *White House's chilling warning about midterm elections: 'Can't guarantee an ICE agent won't be around polling locations'*, The Independent (Feb. 5, 2026), https://perma.cc/R499-CRS5.

[12] Forbes Breaking News, *WATCH: Deputy AG Todd Blanche Calls To Deploy ICE Agents To Polling Sites*, at 01:42–01:47 (YouTube, Mar. 27, 2026), https://www.youtube.com/watch?v=6Km1Zvo8bDw; Rebecca Beitsch, *Blanche: 'Why is there objection to sending ICE officers to polling places?*', The Hill (Mar. 27, 2026), https://perma.cc/K6VF-3EQB; Jacob Knutson, *Deputy attorney general endorses sending ICE agents to voting sites*, Democracy Docket (Mar. 26, 2026), https://perma.cc/UKZ5-ZNE8.

53. By June, the Justice Department had removed from its website a longstanding, publicly available manual that clearly stated that federal agents cannot lawfully conduct law enforcement activities at a polling place.[13] The deleted manual stated that "[t]he effect of [Section 592] is to prohibit FBI Special Agents from conducting investigations within the polls on election day" and that its prohibition applies generally to "agents of the United States Government," making clear that the Polling Place Policy likewise violates the provision.[14]

54. At the same time, the Justice Department has gutted the Public Integrity Section (PIN), which drafted the manual.[15] Previously, PIN organized an Election Day command center to provide real-time legal advice to law enforcement in the field consistent with the manual; this administration appears poised to end that traditional practice.[16]

55. On March 9, 2026, nine Secretaries of State wrote to Defendant Mullin, asking him to confirm that there would not be ICE officers at polling places.[17]

56. In response, on May 11, 2026, then-Acting ICE Director Todd Lyons conceded that "there is no reason for ICE personnel to be deployed to polling places," while still insisting that

---

[13] Letter from Sen. Alex Padilla et al. to Todd Blanche, Acting Att'y Gen. (June 8, 2026), https://perma.cc/YS5Z-X6JN; Office of Sen. Alex Padilla, *Padilla, Durbin, Whitehouse, Colleagues Sound Alarm on Trump Administration Use of Election Crimes Prosecutions to Interfere in Midterm Elections*, Press Release (June 8, 2026), https://perma.cc/9V3T-GZE7.

[14] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 73 (8th ed. 2017), https://perma.cc/NU6K-R72C.

[15] Ryan J. Reilly, Sarah Fitzpatrick & David Rohde, *Justice Department office that prosecutes public corruption slashed in size, sources say*, NBC News (Mar. 11, 2025), https://perma.cc/K3W9-NTFN.

[16] Jose Pagliery, *The Justice Department Hasn't Taken Its Usual Steps to Protect the 2026 Election*, NOTUS (June 8, 2026), https://perma.cc/3QQZ-5P3Q.

[17] Letter from Jena Griswold, Colo. Sec'y of State et al. to Markwayne Mullin, Acting Sec'y of Homeland Security (March 9, 2026), https://perma.cc/RH3X-XKVN.

ICE "plays an important role in investigating voter fraud and will continue to perform this vital mission."[18]

57. Despite this statement, ICE has in fact proceeded to conduct law enforcement operations at polling places.

58. On May 20, 2026, armed ICE agents conducted an enforcement action at an active polling place in San Antonio, Texas where they "swarmed" the parking lot of the polling site to detain an individual in full view of voters before being directed to leave the premises by the county sheriff.[19]

59. On June 2, 2026, a "couple vehicles worth" of armed ICE agents visited an active polling place in Ventura County, California, during a "crush" of voters, as reported by local election officials and volunteers, who said, "It's very intimidating for someone exercising their right to vote."[20]

60. And on June 23, 2026, ICE agents entered an active polling place in Syracuse, New York, to accost an election volunteer. Reportedly, their purpose was to conduct investigative activity regarding a poll worker's social media post *five months earlier* about an ICE agent's shooting of Renee Good in Minneapolis—but they waited until the individual was midway through a shift at a polling place before choosing to confront her.[21]

---

[18] Letter from Todd Lyons, Acting Dir. of ICE, to Jena Griswold, Colo. Sec'y of State (May 11, 2026), https://perma.cc/2S2T-NK9M.

[19] Michael Karlis, *ICE conducts enforcement action at San Antonio voting location, witnesses say*, San Antonio Current (May 20, 2026), https://perma.cc/Z7WT-JRGA.

[20] Wes Woods II, *UPDATED: ICE presence outside Simi Valley vote center raises alarms*, Ventura County Star (June 2, 2026), https://perma.cc/65UZ-XUEA.

[21] Jude Joffe-Block, *She posted about ICE. Five months later, DHS agents told her to take her post down*, NPR (June 26, 2026), https://perma.cc/M8JK-H79T.

61. Taken together, these actions indicate that DHS has developed and acted upon the Polling Place Policy.

**III. The Polling Place Policy Intimidates Plaintiffs' Members and Interferes in Plaintiffs' Missions.**

62. The fact that DHS Defendants' Polling Place Policy violates federal law makes clear that ICE and its agents will conduct themselves as they see fit, without regard for the rule of law, placing citizens in fear that their rights will be similarly disregarded if they encounter ICE agents at polling places during the upcoming election.

63. That fear is well-founded. ICE has repeatedly conducted enforcement operations in which they stop, seize, and interrogate people based on how they look, what language they speak, and where they work, rather than on individualized suspicion that a particular person lacks lawful status—making clear that U.S. citizenship is no bar to being detained and interrogated.

64. In *Vasquez Perdomo v. Noem*, the United States District Court for the Central District of California found that agents conducting "roving patrols" in the Los Angeles area were making stops on the basis of apparent race or ethnicity, spoken language or accent, and the type of work a person appeared to perform, and enjoined the practice. 790 F. Supp. 3d 850, 864, 890, 894 n.33 (C.D. Cal. 2025). The Ninth Circuit denied the government's motion for a stay pending appeal. 148 F.4th 656 (9th Cir. 2025).[22]

65. In particular, the Ninth Circuit credited evidence that armed ICE agents had, on multiple occasions, detained U.S. citizens on the basis of their apparent race or ethnicity, throwing

[22] The Supreme Court later stayed the district court's injunction. *Noem v. Vasquez Perdomo*, 600 U.S. __, 146 S. Ct. 1 (2025). Justice Kavanaugh, concurring, explained that the stay was granted on the basis that plaintiffs likely lacked standing to sustain a broad injunction, and that the government had a "fair prospect" of succeeding on its Fourth Amendment defense—but he did not question the veracity of the findings that ICE agents had detained U.S. citizens on the basis of apparent race or ethnicity. *Id.* at 1–4 (Kavanaugh, J., concurring).

them against walls, telling them to "Shut the f*ck up," and demanding to know what hospital they had been born in. *Id.* at 667–70. In one instance, after ordering one citizen to present identification to prove his claim that he was an American, the agents, armed with "military-style rifles," took his phone, detained him for twenty minutes, and then released him—without ever returning the Real ID he had given them to prove his citizenship, leaving him vulnerable to the next "roving patrol." *Id.* at 667.

66. United States citizenship is thus no protection against the threat of being subjected to federal force and interrogated by armed ICE agents. An investigation by ProPublica identified more than 170 instances of ICE detaining U.S. citizens, where "Americans have been dragged, tackled, beaten, tased and shot by immigration agents."[23] More than 50 of those citizens—nearly all of them Latino—were held after agents questioned their citizenship.[24] And more than 20 were held for more than a day without being afforded the right to call a lawyer or their loved ones.[25]

67. A Pew Research Center poll published in November 2025 found that over a six-month period, five percent of Latinos surveyed had "been stopped by authorities and asked about their U.S. citizenship or immigration status"—a rate that remained the same for U.S.-born Latinos as for those who immigrated to the United States.[26]

68. On March 5, 2025, in the course of a large-scale federal immigration enforcement operation in Northern Virginia, ICE officers surrounded the vehicle of Jensy Machado—a

---

[23] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[24] *Id.*

[25] *Id.*

[26] Carolyne Im & Luis Noé-Bustamante, *Latinos' Experiences with Immigration Enforcement in Trump's Second Term*, Pew Research Center (Nov. 24, 2025), https://perma.cc/QNK2-UABQ.

naturalized United States citizen and Manassas resident—with their weapons drawn. They ordered him from his vehicle, refused his offers to produce his REAL ID-compliant Virginia driver's license, handcuffed him, and questioned him about how he entered the country. Officers released him only after he was permitted to produce identification.[27]

69. The risk extends to anyone who tries to intervene to help individuals accosted or detained by ICE. ProPublica identified "about 130 Americans, including a dozen elected officials" who have been "accused of assaulting or impeding officers."[28]

70. ICE officers have wounded or killed multiple U.S. citizens who attempted to assist individuals accosted by ICE.[29]

71. The result is that as citizens go to the polls this fall, they are confronted by the possibility of armed force—agents carrying guns who may stop them based on how they look and what language they speak, detain them forcefully, interrogate them, and prevent them from seeking help.

72. Even citizens who are *not* specifically confronted by ICE agents may be intimidated from voting by the presence of ICE agents at or near voting sites.

---

[27] Jackie Bensen, *'Just following Hispanic people': Citizen detained by ICE questions vote for Trump*, NBC Washington (Mar. 8, 2025), https://perma.cc/J9WR-QARU; Jackie Bensen, *Sen. Warner seeks answers on why ICE detained a US citizen in Manassas*, NBC Washington (Mar. 21, 2025), https://perma.cc/SWG5-N6QC.

[28] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[29] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

**A. The Polling Place Policy Intimidates LULAC's Members and Threatens Its Voter Engagement Mission.**

73. Plaintiff LULAC represents members in every state in the union through its 359 local councils. LULAC has 896,972 members nationwide, of whom approximately 83% are registered to vote.

74. LULAC members have informed LULAC that they are worried immigration officers will be present at polling places, and that they are discouraged from turning out to vote because they fear being singled out on the basis of their appearance, accent, or surname.

75. At LULAC's annual legislative conference in Washington, D.C., on February 24, 2026, leadership heard from members and local community advocates about safety concerns and fear related to ICE targeting Latino individuals. Members voiced specific concerns about the upcoming election and whether ICE agents would be present at polling places, citing fear that they would be targeted for trying to exercise their right to vote.

76. At LULAC's annual national convening in Fort Worth, Texas, on June 17-20, 2026, members again expressed concern about ICE agents at the polls based on statements made by the Trump-Vance administration and reports of ICE agents in fact showing up at polls during primary voting. In particular, members indicated that they were concerned about the suppressing effect that armed ICE agents would have on voter turnout given the threat that ICE agents would appear at polls nationwide, across multiple states, rather than isolated city-specific instances.

77. LULAC has likewise heard from local council leadership by email and conference calls about local concerns related to members' willingness to participate in the upcoming election given their fears that ICE agents will be present.

78. In response, LULAC has created new know-your-rights trainings and educational campaigns to inform members about their rights if confronted by ICE, at the polls or elsewhere,

and to train volunteers on how to educate others in their community and monitor such incidents. It has had to expend a significant amount of time and resources originally intended for get-out-the-vote efforts to instead respond to members' legitimate concerns regarding their safety and constitutional rights in advance of the upcoming election.

79. On December 5-7, 2025, LULAC conducted a series of know-your-rights trainings across three cities in three days in Bend, Eugene, and Portland, Oregon, in response to community concerns arising out of ICE's operations in Portland in September to December 2025. LULAC partnered with the National Education Association and the Oregon Education Association, training 1,500 people regarding their civil and constitutional rights regarding interactions with ICE officials.

80. Over the last few months, LULAC developed a new Community Liaison Fellows (CLF) program to ensure Latino voters in their region are informed about their civil rights, races and candidates, and early voting and Election Day deadlines and locations, for which LULAC has developed new trainings.[30] Because of persistent concerns about ICE at the polls, LULAC has been forced to include materials about how to respond to the presence of armed ICE officers at the polls and what voters' rights are in such a situation.

81. LULAC also plays a coordinating role among advocacy organizations, sharing training materials and ensuring efficient responses to community concerns across multiple organizations. Given the prevalence of concerns about ICE's enforcement operations, especially in light of the upcoming election, LULAC has had to spend significant time responding to

[30] *Community Liaison Fellows*, LULAC, https://perma.cc/83G6-L53W (last visited Sep. 8, 2026).

organizations' concerns and distributing materials designed to allay concerns and help local organizers respond to community members' fears.

82. Many states offer multiple options for a voter to physically cast their vote, in addition to voting in-person on Election Day at local polling places. Depending on the state, these additional options include but are not limited to: early in-person voting, either at a central office or at satellite locations; mobile or curbside in-person voting (often for voters over 65, or voters with disabilities); or delivering mail ballots in-person to a secure ballot drop box.

83. These polling locations all constitute places where the 2026 general election is held under 18 U.S.C. § 592.

84. Early voting begins in several states, including where LULAC has members, on September 18, 2026.

85. Early voting in other states where LULAC has members, including Maryland, Illinois, New Mexico, and Ohio, also begins in September or October.

86. As a result, the Polling Place Policy creates a persistent threat to LULAC's members around the country as they make plans for voting and volunteering in the upcoming election.

87. This extended threat to its members will interfere with LULAC's get-out-the-vote mission, making it more difficult to conduct planned voter registration and get-out-the-vote programming, and forcing it to perform additional work through its Community Liaison Fellowship program and other know-your-rights trainings to educate its members about their legal rights and obligations when confronted by ICE agents in the run up to early voting and Election Day.

## B. The Polling Place Policy Directly Interferes With Common Cause's Election Protection Mission.

### *i. Common Cause's Election Protection and Voter Assistance Program*

88. Election Protection is Common Cause's national, nonpartisan voter assistance and voter protection program—one of the largest programs Common Cause runs. Common Cause recruits, trains, and deploys volunteers who monitor polling places and ballot drop boxes during early voting and on Election Day; answer voters' questions; provide language assistance; help voters who are turned away, sent to the wrong location, or told they are not on the rolls; and report problems to election officials so that they are fixed while voting is under way. Common Cause runs command centers that receive those reports and escalate them to election officials, volunteer attorneys, and state attorneys general; maintains year-round working relationships with state and county election officials; monitors changes in election procedures and helps voters navigate them; distributes palm cards and other materials that help voters understand their rights at the polls; and trains others to do the same. Common Cause leads or co-leads statewide Election Protection programs in many of the states where it has staff.

89. The program is already under way for the 2026 general election. Common Cause, in nearly two dozen states, is recruiting, training, and deploying thousands of poll monitors and ballot drop box monitors; hundreds of additional volunteers in de-escalation, peacekeeping, and command center roles; and volunteer attorneys who respond in the field. Poll monitor trainings are running or scheduled in every one of those states between August and October 2026. In Colorado alone, Common Cause recruited nearly 500 volunteers by late August. In North Carolina, Common Cause is holding "Ready to Vote" trainings in all 100 counties to help community and campus leaders assist voters overcome barriers to voting. In Ohio, Common Cause is training volunteers

to monitor polling places and county boards of elections so that provisional ballots are counted, and election procedures are followed.

### *ii. Adverse Impacts to Common Cause's Programs and Members*

90. Common Cause's members and Election Protection volunteers live and vote in the communities where ICE has been active. Common Cause members have reported to Common Cause that they or someone in their family, neighborhood, or community has been affected by immigration enforcement activity. Common Cause members have reported that fear of immigration enforcement has caused them or people they know to avoid going to work, school, and the grocery store, taking walks in their neighborhoods, and participating in elections.

91. Common Cause members have told Common Cause that fear of ICE will change how they take part in the November 2026 election, including changing their method of voting and being less likely to volunteer as election monitors, less likely to serve as poll workers, less likely to volunteer to help register others to vote, and less likely to drive voters to the polls. The Polling Place Policy tells Common Cause members that armed ICE officers may be inside or near the polling place when they arrive to vote, interpret for a neighbor, or help a voter who has been turned away.

92. Common Cause volunteers have observed federal immigration enforcement at and near polling places and its effect on voters, volunteers, and election officials.

93. In Florida, a Common Cause poll monitor observed a Section 287(g) checkpoint approximately one mile from a polling location and an armed guard in paramilitary gear at the door of a polling location in Lee County, in a Latino neighborhood. This created a reasonable fear that federal ICE agents will operate at election sites.

94. In New York, where armed ICE agents entered an active polling place in Syracuse on June 23, 2026, *see supra* ¶ 60, Asian-language-speaking translators told Common Cause that

they feared providing translation services at the polls. Common Cause has had to expend more resources towards recruiting Election Protection volunteers for the state primary.

95. In Colorado, at least one county sheriffs' office conducts warrant checks at polling locations and cooperate with ICE. This raises fears for Common Cause members in such counties, as voters from mixed-status households may not know if a deputy is there to keep order or to share information with ICE.

96. In March 2026, Colorado's Secretary of State asked Defendants to confirm that ICE officers would not be present at polling places, but they did not provide that assurance. *See supra* ¶¶ 55–56.

97. Defendants' Polling Place Policy, and the statements and enforcement actions through which Defendants developed it, *see supra* ¶¶ 49–61, have forced Common Cause to undertake programmatic activities it would not otherwise have undertaken, and to redirect staff time, volunteer time, and money from assisting voters and monitoring polling places to preparing voters and volunteers for encounters with armed federal agents. Those activities include the following.

98. In Texas, Common Cause developed a "Voting & Immigration Presentation," a "Vote Safe from ICE in Texas Toolkit," and an explainer titled "Vote Safe from ICE in Texas." They began delivering the training to voters and volunteers in February 2026 at Trinity University in San Antonio. For the general election, Common Cause is recruiting and training hundreds of safety monitors to work alongside hundreds of poll monitors and volunteer attorneys, has scheduled three dedicated safety-monitor trainings on September 23, October 10, and October 20, and is adding de-escalation training for volunteers, none of which the program included before.

99. In Florida, after the Lee County observation described above, Common Cause held a training for volunteer poll monitors on what to do if they encounter ICE at the polls and on how observers can peacefully exercise their First Amendment right to document what they see; added a section on immigration enforcement to the Florida poll monitor training; is developing a "Vote Safe from ICE" resource for Florida based on the Texas materials; and is sending letters to election officials and sheriffs about immigration enforcement at the polls.

100. In New York, because members and Election Protection volunteers expressed fear of ICE at the polls, Common Cause added an "ICE Watch" component to the Election Protection program, participated in ICE Watch trainings, supported Hands Off NYC's trainings, and now coordinates with ICE Watch across the state. Common Cause drafted procedures for a report of federal agents at a polling place, under which Common Cause verifies the report, notifies state officials, gauges the need for litigation, ensures volunteer safety, and releases prepared calming messages; is running those scenarios alongside state officials in September 2026; and is recruiting hundreds of clergy to serve as de-escalation volunteers and peacekeepers at the polls. Common Cause also redirected staff time and member time to state legislation: they issued support memos for the Protect Polling Places bill (A9345/S8596), which would prohibit civil arrests, including immigration arrests, of anyone going to, remaining at, or returning from a polling place; briefed legislators twice on federal threats to elections; prepared a handout on federal incursions for the January 2026 New York State Election Commissioners conference; asked members by email and at a town hall to call their legislators; and lobbied the Legislature and the Governor to add protections against immigration enforcement to the state budget, some of which were enacted.

101. In Georgia, Common Cause is training poll observers to document in detail any federal law enforcement presence at polling locations; is training observers on end-of-day shifts to

remain an extra hour after the polls close in case federal agents attempt to take ballots from poll workers; and is working on a campaign encouraging voters to vote early in person, so that Common Cause observers can assist voters who are intimidated by ICE presence at a polling location and direct them to the nearest polling location confirmed to be free of that presence. Common Cause also facilitated three community conversations at which residents learned their rights from an immigration and criminal defense perspective and received Know Your Rights cards explaining the difference between a judicial warrant and an administrative order; coordinated legal clinics for families affected by the immigration raid at the Hyundai plant; and coordinated a meeting with the Gwinnett County Sheriff about his office's cooperation with ICE, followed by a press conference and a letter campaign opposing a Section 287(g) agreement in Gwinnett County.

102. In Maryland, Common Cause is working with ICE Watch groups that can alert them to federal agents near polling places so that Common Cause can notify the State Board of Elections, which coordinates with state and local officials; is developing a rapid crisis response protocol for federal agents interfering in elections; is planning protocols regarding federal agents at polling places; and plans, where it is safe, to send additional volunteers to assist voters to exercise their rights and help them enter polling places. Because of Defendant's Polling Place Policy, Common Cause has prioritized Prince George's County, Baltimore City, and Montgomery County, home to a large population of new Americans, for the hundreds of poll monitors it is deploying.

103. In California, Common Cause is conducting Know Your Rights trainings and webinars to help voters understand their rights if they encounter federal agents during the election period; added the subject to Election Protection trainings for Common Cause members; and presented to elected officials at shadow hearings in April 2026 on federal agency deployments in California and during elections.

104. In Arizona, Common Cause is training Election Protection volunteers to redirect voters to safer locations when harassment occurs and to identify polling locations by their proximity to ICE offices and staging locations, so that the hundreds of poll monitors Common Cause is deploying on Election Day can be placed where voters most need assistance.

105. In Colorado, Common Cause is directing recruitment and poll monitoring to voters at risk of ICE enforcement encounters, including voters in mixed-status households, and to localities with increased ICE presence; added ICE facilities to the map used to plan poll monitoring; opened a line of communication with the state's ICE response network; will re-train poll monitors and issue advisories regarding federal law enforcement activity near voting sites; and will hire an outside practitioner to provide de-escalation and safety training that Common Cause cannot provide itself.

106. In Minnesota, Common Cause brought the state's grassroots immigrant rapid response organizations into its Election Protection program so that reports of ICE or federal agents near polling places can be verified and answered in real time on Election Day, and is funding organizations in several counties to help voters who are too afraid to vote in person make a plan to vote early or by mail.

107. In North Carolina, Common Cause is partnering with immigrant rights organizations to recruit volunteers for trained verifier and de-escalation programs that expand the existing poll presence program; broadening the network of "safe sites" in and around early voting sites and Election Day precincts; supporting Spanish-language media with voter guide updates and access to Know Your Rights trainings; directing canvass monitoring and poll presence to the places where ICE or military deployments would do the most harm; and recruiting legal monitors to provide legal defense for affected voters.

108. In Oregon, where voting is by mail, Common Cause now recruits, trains, and manages a team of hundreds of ballot drop box monitors across nearly a dozen counties with higher levels of ICE activity, and is working with other programs to address ICE activity at drop boxes.

109. In Rhode Island, Common Cause added guidance on immigration enforcement to poll monitor training, added questions to monitors' checklists, is recruiting bilingual monitors for counties with higher immigrant populations, and is monitoring the Board of Elections' implementation of a new state law restricting ICE at the polls.

110. In Indiana, Common Cause is expanding de-escalation training for poll monitors, recruiting hundreds of de-escalation volunteers, and conducting outreach in immigrant communities.

111. In New Mexico and Nebraska, Common Cause is preparing volunteers and election officials to respond to federal law enforcement near polling locations and to assist voters with their rights if agents appear.

112. Each of these activities draws on staff time, volunteer time, and money that Common Cause would otherwise spend encouraging voters to vote, assisting voters at the polls, and monitoring compliance with election procedures.

113. Defendants' Polling Place Policy also makes it harder for Common Cause to recruit volunteers its programs depend on; requires Common Cause to train volunteers for encounters with armed federal law enforcement rather than for the voter assistance the program exists to provide; and forces Common Cause to spend resources on workarounds, such as helping voters vote early or by mail to avoid the polls, that reduce rather than expand in-person participation.

114. Defendants' Polling Place Policy intimidates Common Cause members from voting, as they have voted in past elections. Members who are naturalized citizens or who are

perceived to be foreign-born now face the prospect of interrogation, detention, or family separation as the price of casting a ballot in person or of helping a neighbor to do so. The interests Common Cause seeks to protect in this action are germane to its purpose: Common Cause exists to empower people to make their voices heard in the political process and to protect every eligible voter's freedom to cast a ballot without fear. Neither the claims asserted nor the declaratory and injunctive relief requested requires the participation of individual Common Cause members

**C. The Polling Place Policy Interferes with UnidosUS's Voter Outreach.**

115. The Polling Place Policy has directly interfered with the delivery of the voter outreach program that is central to the mission and work of UnidosUS. *See supra* ¶ 25. Voters concerned about stories of ICE at polling centers now ask whether they may encounter armed federal immigration officers at their polling place. As a result, UnidosUS staff must address that subject in the course of outreach—time that would otherwise be devoted to registration and voting preparation.

116. UnidosUS's outreach capacity is finite. Each contact occupies a fixed amount of staff time and investment. Time and resources spent addressing the prospect of armed federal officers at polling places is time and resources not spent reaching additional voters. The direct and predictable consequence is that UnidosUS reaches fewer voters than it otherwise would, and that the voters it does reach receive less of the registration and preparation assistance the program exists to provide.

117. UnidosUS is about to launch a multi-layered voter education campaign encompassing phone calls, text messaging, terrestrial radio and streaming audio ads, and digital ads. Increasing time and message space devoted to addressing the prospect of armed federal officers at polling places necessarily displaces other content on registration and voting-preparation

within that campaign. The effect of the Polling Place Policy is that UnidosUS will deliver less of the assistance the campaign is designed to provide to fewer voters, than it would absent the Policy.

118. Separately, for the 2026 cycle UnidosUS is recruiting and training voter protection navigators drawn from its Affiliate network, planning to recruit and train approximately 40 navigators across 14 states. Navigators provide assistance to voters during early voting and on Election Day, helping them troubleshoot any issues and connect voters with Election Protection hotlines or lawyers where necessary. Navigator recruitment and training are activities UnidosUS conducts itself and funds from its own resources. The training curriculum addresses, among other subjects, the prospect of armed federal officers at polling places.

119. The Polling Place Policy has also interfered with UnidosUS's navigator program. The prospect of armed federal officers at polling places has discouraged prospective navigators from enrolling in and completing training. Multiple organizations invited to join the navigator training program declined to participate, citing the hostile operating environment, including the prospect of armed federal agents at polling places. That falloff is the predictable effect of the Polling Place Policy on the decisions of the individuals UnidosUS seeks to recruit. Now, rather than training navigators to help overcome barriers and gaps related to voter registration, ballot access, and election procedures, UnidosUS must train navigators to dedicate time and effort to addressing voters' safety and security concerns at polling places, what protections will be in place to protect voters from voter intimidation, and the proper steps to take should a voter be confronted by an armed federal agent at a polling place.

120. Absent the Polling Place Policy, UnidosUS would reach more voters with basic and traditional registration and preparation assistance, would devote its outreach contacts to that

assistance rather than to the prospect of armed federal officers, and would recruit and train its planned complement of navigators without the resources required to address the Policy.

**IV. The Polling Place Policy Interferes Plaintiff Denver's Election Administration.**

121. Plaintiff City of and County of Denver, by and through the Denver Clerk and Recorder ("Clerk"), is responsible for administering all aspects of federal, state, and local elections for the jurisdiction. Colo. Rev. Stat. § 1-1-110 (2026); Colo. Const. art. XX, § 6.

122. Denver is home to a large immigrant population, with foreign-born residents making up roughly 14% of the population. These include roughly 41,000 residents born in Mexico, 4,000 born in Vietnam, and 3,000 born in Ethiopia, making it a likely target for ICE activity during the midterm election.[31]

123. Denver has already been a target for ICE activity. For example, on July 20, 2026, ICE agents stopped and detained Chantal Alejandra Morales Rojas, a 27-year-old Ecuadorian software developer and former au pair with a pending visa application at the Denver International Airport.[32]

124. In another high-profile incident in Denver, ICE detained a family of three, including a one-year-old baby, outside Denver Immigration Court after a scheduled immigration hearing.[33]

125. Denver will begin mailing ballots to all active registered voters no later than Monday, October 5, 2026. On that day, all 24-hour drop boxes will open to receive ballots.

---

[31] *B05006 - Place of Birth for the Foreign-Born Population in the United States (sorted by Denver County, Colorado)*, U.S. Census Bureau, https://perma.cc/Y7YS-6E2X (last accessed Sep. 10, 2026).

[32] Elizabeth Hernandez, *Woman detained by ICE at DIA files habeas petition challenging arrest*, The Denver Post (July 25, 2026), https://perma.cc/Y6GG-5HWF.

[33] Chase Woodruff, *Colorado advocates decry ICE courthouse arrest of immigrant family*, Colorado Newsline (May 30, 2025), https://perma.cc/N8U2-KBFK.

126. The early voting period begins in Denver on October 12. Denver's main Voter Service and Polling Center (VSPC), located at Denver Central Library, opens on that day, with additional VSPCs opening between then and Election Day, November 3. On Election Day, all VSPCs will be open until 7:00 PM MST.

127. In the early voting period and on Election Day, election officials in Denver are responsible for setting up and operating VSPCs, checking in voters and issuing them ballots, managing all incoming mail ballots, collecting ballots from drop boxes, meticulously securing the ballot chain of custody, conducting voter outreach and support, and processing and counting ballots.

128. Election officials in Denver reasonably expect that the presence of armed federal law enforcement officers at election sites would disrupt these activities and intimidate voters and election workers. Under the state's Uniform Election Code ("Election Code"), only election officials, credentialed election watchers, and voters are permitted within polling locations. *See* Colo. Rev. Stat. §§ 1-7-105–08, 1-7-115 (2026). In addition, the election security rules promulgated by the Colorado Secretary of State require the Clerk to restrict access to secure ballot areas and secure equipment areas. 8 Colo. Code Regs. § 1505-1:20.4 (2026). Any effort by federal agents to enter these areas would violate state law, breach election security requirements, create confusion and uncertainty for voters and election staff, and potentially disrupt the Clerk's ability to conduct the election. If federal agents gained unauthorized access to secure areas housing the City's voting and tabulation equipment, it could also cause a decertification of the City's election equipment under the Election Code and the Secretary of State's administrative rules. This would stop the Clerk from being able to use the equipment, compromising the Clerk's ability to timely process and tabulate ballots.

129. Roughly ninety percent of voters who cast a mail ballot in Denver return their ballot to one of the forty-eight 24-hour drop boxes throughout Denver. Teams of election judges and staff are required by the Election Code to collect the ballots from the boxes; in the time immediately preceding the election the ballots must be collected daily. The presence of armed federal agents at the drop boxes may deter Denver voters from returning their ballots and may intimidate or disrupt election judges and staff from attempting to collect those ballots, impairing the Clerk's ability to collect ballots as required by Colorado law.

130. Election officials in Denver reasonably expect that, to prepare for the presence of armed federal agents at Denver election sites, election officials will need to spend a significant amount of time, energy, and resources to modify the current election administration plan. The Clerk has already begun modifying training for election judges and educating staff on how to respond to the presence of federal agents. The Clerk has also scheduled training for election staff on how to deescalate interactions with federal agents, how to identify federal agents who may be in plain clothes, how to document the presence of federal agents, and when to request assistance related to the presence of federal agents. Election officials will also have to develop contingency plans for voters at election sites in which federal activity is occurring, including plans for alternative polling locations. Election officials will also have to create a large-scale public messaging plan to rapidly communicate with voters in the event that federal agents appear at election sites or drop boxes.

131. Election officials in Denver reasonably expect that the presence of armed federal agents at VSPCs will deter, discourage, and intimidate poll workers. At a practical level, elections in Denver are conducted in large part by hundreds of bipartisan election judges. Under the Election Code, election judges perform essential services, including conducting in person voting, processing ballots, conducting signature verification, tabulating ballots, assisting with voter

registration, and collecting ballots from the 24-hour drop boxes. Colo. Rev. Stat. §§ 1-6-100.3 (defining "election judge"), 1-7-110–11 (in-person voting), 1-7-301–09 (processing and counting paper ballots), 1-7.5-107.3 (signature verification), 1-7-507 (electronic vote-counting), 1-2-217.7 (voter registration on or before Election Day), 1-7.5-107 (collecting ballots from drop boxes) (2026). Election judges are citizens who perform these essential duties on a temporary basis, and the Clerk struggles to recruit adequate numbers of judges for each election. The possibility of confronting armed federal agents in the course of these duties is expected to cause concern and anxiety for election judges attempting to complete their duties, and individuals may no longer be willing to perform this work. Losing large numbers of election judges during the election cycle would impair the Clerk's ability to administer the election, impose significant costs to train replacement judges for that election, and hinder the ability to timely tabulate and report results. In particular, on Election Day, when the majority of Denver's in-person voters vote, the Clerk's ability to move voters through VSPCs efficiently, avoid long lines, and ensure every eligible voter in Denver has the opportunity to vote hinges on having adequate numbers of election judges.

132. Election officials in Denver reasonably expect that the presence of armed federal agents at polling locations or 24-hour drop boxes will deter, discourage, and intimidate voters. This may include voters opting not to go to the polls at all, leaving once they observe armed federal officials without casting or dropping off their ballots, or declining to use Colorado's same-day voter registration process.

## CLAIMS FOR RELIEF

**Count I**
**Violation of the APA, 5 U.S.C. § 706(2)(A):**
**Arbitrary and Capricious and Contrary to Law**
*All Defendants*

133. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

134. Defendants, as confirmed through public statements, have adopted a new Polling Place Policy that authorizes armed federal Immigration and Customs Enforcement officers to go to places where voters cast their ballots, for the purpose of conducting routine civil immigration enforcement or customs enforcement.

135. The Polling Place Policy is not tentative: it has been announced with clarity and ICE agents have acted pursuant to it on multiple occasions already. And it definitively purports to determine the legal authority of ICE agents to go to polling places as necessary for routine immigration and customs enforcement, which has legal consequence for voters as they head to the polls in the coming weeks and election officials as they prepare to and administer the election. The Polling Place Policy thus constitutes final agency action within the meaning of 5 U.S.C. § 704.

136. DHS Defendants failed to engage in a reasoned decisionmaking process before enacting and announcing the Polling Place Policy. DHS Defendants did not seek feedback or public engagement, did not consider the likely effect of authorizing armed federal officers to go to places where elections are held, including the potential violation of state law, and did not explain its decision.

137. The Polling Place Policy directly conflicts with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed officers at polling locations for any reason other than repelling armed enemies of the United States.

138. For these reasons, the Polling Place Policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). It should, accordingly, be held unlawful and "set aside." *Id*. § 706(2).

**Count II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(C):**
**In Excess of Statutory Authority or Limitation**
*All Defendants*

139. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

140. The Polling Place Policy directly conflicts with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed officers at polling locations for any reason other than repelling armed enemies of the United States.

141. The Polling Place Policy thus exceeds the scope of Defendants' statutory authorization or limitations.

142. Defendants' authority to conduct law enforcement operations, including serving warrants or detaining individuals suspected of being unlawfully present under federal immigration law, is limited by federal law, including 18 U.S.C. § 592.

143. Defendants' announcements of the Polling Place Policy make clear that they intend to authorize or direct armed federal Immigration and Customs Enforcement officers to conduct routine civil immigration enforcement, such as serving warrants or detaining individuals, at polling places. That exceeds the clear limitation of 18 U.S.C. § 592 that armed individuals may only be permitted at polling places for the exclusive purpose of repelling armed enemies of the United States.

144. For that reason, the Polling Place Policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C). It should, accordingly, be held unlawful and "set aside." *Id.* § 706(2).

**Count III**
**Declaratory Judgment Act**
*All Defendants*

145. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

146. Plaintiffs are entitled to declaratory relief on the basis of all claims identified. There is a substantial and ongoing controversy between Plaintiffs and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that (1) Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592; and (2) any deployment of armed federal officers to polling places under the Polling Place Policy is therefore unlawful and beyond Defendants' statutory authority.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1. Declare unlawful, set aside, and enjoin the Polling Place Policy;

2. Declare that Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592;

3. Enjoin Defendants and their inferior officers from operating or carrying weapons in the vicinity of open polling places, including dropboxes, curbside voting locations, and similar places where votes are taken, collected, received, counted, or certified during early voting periods and on Election Day itself, for any reason other than repelling armed enemies of the United States;

4. Award costs and reasonable attorneys' fees incurred in this action; and

5. Grant such other relief as the Court may deem just and proper.

September 10, 2026

Respectfully submitted,

/s/ *Jennifer Holmes*

Jennifer A. Holmes (DC Bar No. 1018798)
Toby Merrill*
Kyra Sikora*
Graham Provost*

Public Rights Project
490 43rd Street, Unit 115
Oakland, CA 94609
(510) 738-6788

jennifer.holmes@publicrightsproject.org
toby.merrill@publicrightsproject.org
kyra.sikora@publicrightsproject.org
graham.provost@publicrightsproject.org

*Counsel for City & County of Denver*

/s/ *Orlando Economos*

Orlando Economos (DC Bar No. 90013791)
Ronald A. Fein (DC Bar No. 90026641)
J.P. Cooney (DC Bar No. 494026)
Molly Gaston (DC Bar No. 90045824)
Brian D. Netter (DC Bar No. 979362)

Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

oeconomos@democracyforward.org
rfein@democracyforward.org
jpcooney@democracyforward.org
mgaston@democracyforward.org
bnetter@democracyforward.org

*Counsel for Plaintiffs*

**motions for admission pro hac vice forthcoming*