**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEAGUE OF UNITED LATIN AMERICAN CITIZENS
1150 18th Street NW, Suite 650
Washington, DC 20036

COMMON CAUSE
805 15th Street NW, Suite 800
Washington, DC 20005

COMMON CAUSE EDUCATION FUND
805 15th Street NW, Suite 800
Washington, DC 20005

UNIDOSUS
1126 16th Street NW, Suite 600
Washington, DC 20036

CITY AND COUNTY OF DENVER, COLORADO
201 West Colfax Avenue, Dept. 1011
Denver, CO 80202

HENNEPIN COUNTY, MINNESOTA
300 South 6th Street
Minneapolis, MN 55487

*Plaintiffs*,

*v.*

U.S. DEPARTMENT OF HOMELAND SECURITY,
245 Murray Lane SW
Washington, DC 20528

MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
245 Murray Lane SW
Washington, DC 20528

Case No. 26-cv-3157

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
500 12th Street SW
Washington, DC 20536

DAVID VENTURELLA, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC 20536

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530

TODD BLANCHE, in his official capacity as Attorney General of the United States,
950 Pennsylvania Avenue NW
Washington, DC 20530

FEDERAL BUREAU OF INVESTIGATION
935 Pennsylvania Avenue NW,
Washington, D.C. 20535

KASH PATEL, in his official capacity as Director of the Federal Bureau of Investigation,
935 Pennsylvania Avenue NW,
Washington, D.C. 20535

*Defendants*.

**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. In the final months of the Civil War, Congress, in order to preserve free and fair elections in the dearly defended union, enacted a law prohibiting federal officials, on penalty of fine and imprisonment, from ordering or placing "any troops or armed men at any place where a

general or special election is held, unless such force be necessary to repel armed enemies of the United States."[1]

2. Congress was concerned about executive overreach, and the risk that the federal executive would use armed force to interfere in state and federal elections.[2]

3. Since 1865, the executive branch has generally respected and obeyed the Civil War-era prohibition on armed federal agents at polls. For example, the Department of Justice's election-law enforcement manual, followed for the past four decades, states that this provision "makes it a felony for any federal official to send 'armed men' to the vicinity of open polling places."[3]

4. And for decades, the federal government has been the principal protector of the fundamental right to vote, seeking to secure the freedom of our elections, reviewing and litigating the fairness of electoral processes in the several states.

5. In 1965, to ensure the right to vote protected by the 14th and 15th Amendments could be realized by all voters, Congress passed the Voting Rights Act of 1965. Among other protections, it provides that "no person" may "intimidate, threaten, or coerce" anyone "for voting or . . . for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b).

6. But in the lead-up to the 2026 midterm election, officials in the Trump-Vance administration have spoken openly about sending armed federal agents to polling places, intimidating voters and those who would lawfully urge or assist them to vote, and violating federal law.

---

[1] Act of February 25, 1865, Pub. L. No. 38-52, ch. LII, 13 Stat. 437, codified as amended at 18 U.S.C. § 592.

[2] Chris Mirasola, *Domestic Military Deployments After Trump v. United States*, 67 Wm. & Mary L. Rev. 189, 204–205 (2025).

[3] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 9 (8th ed. 2017), https://perma.cc/NU6K-R72C; Craig C. Donsanto & Nancy L. Simmons, *Federal Prosecution of Election Offenses* 10 (7th ed. 2007), https://perma.cc/K59Z-7CDX.

7. On September 1, 2026, Secretary of Homeland Security Markwayne Mullin confirmed and clarified the Department of Homeland Security's policy of authorizing armed Immigration and Customs Enforcement officers to go to polling places—not to repel armed enemies of the United States, but to conduct civil immigration and customs enforcement operations, including serving warrants and detaining individuals suspected of being unlawfully present in the United States.

8. On September 15, 2026, Director of the Federal Bureau of Investigation Kash Patel, when asked under oath to confirm that the FBI "w[as]n't going to be sending people to the polls," responded, "When did you hear that? It's just another lie. . . . Election integrity is of paramount importance, this FBI is not going to shy away from that effort."[4]

9. This articulation and revelation of federal policy, adopted by both ICE and the FBI, follows on the heels of months of comments, guidance changes, and law enforcement activities that make clear that the administration has unlawfully claimed for itself the purported authority to send armed federal officers, including ICE and FBI agents, to polling places over the course of the 2026 midterm election to carry out immigration and law enforcement operations—not, as exclusively provided under federal law, to "repel armed enemies of the United States."

10. Defendants Mullin, the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Acting ICE Director David Venturella (together, "DHS Defendants") and Defendants Todd Blanche, U.S. Department of Justice, Kash Patel, and the Federal Bureau of Investigation (together, "DOJ Defendants") have each adopted and are

---

[4] U.S. Senate Committee on the Judiciary, *Oversight Hearing: Oversight of the Federal Bureau of Investigation* (Sep. 15, 2026), https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-15-2026; *see also* Reuters, *LIVE: FBI Director Kash Patel testifies at US Senate hearing*, at 2:21:10 – 2:21:35 (YouTube, Sep. 16, 2026), https://www.youtube.com/live/36W3fhIB4Bs?t=8434s.

implementing a policy of authorizing their respective agents to go to polling places for reasons beyond the express limitations of federal law.

11. DHS Defendants have adopted a policy authorizing armed ICE agents to go to polling places for purpose of immigration and customs enforcement, including serving warrants (the "DHS Polling Place Policy").

12. DOJ Defendants have adopted a policy authorizing armed FBI agents to go to polling places for the purpose of election integrity enforcement operations (the "DOJ Polling Place Policy").

13. Neither the DHS Polling Place Policy nor the DOJ Polling Place Policy is calibrated to conform to the limits of federal law.

14. The DHS Polling Place Policy and the DOJ Polling Place Policy (together, the "Polling Place Policies") each authorize armed agents to go to polling places for routine enforcement operations that do not fall within the sole reason they would be permitted: to "repel armed enemies of the United States." 18 U.S.C. § 592. Defendants' adoption of their respective Polling Place Policies violates the express criminal prohibition of 18 U.S.C. § 592 and intimidates voters in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b).

15. The specter of armed officers at polling places threatens the freedom of this upcoming election. It places voters in fear that they will be confronted by armed federal officers if they choose to cast a ballot. It interferes with the smooth administration of local, state, and federal elections. And it frustrates the ability of local law enforcement to respond appropriately to security incidents when needed, provide security and safety at polling places, and enforce local and state laws relating to voter interference and intimidation.

16. Plaintiffs League of United Latin American Citizens ("LULAC"), Common Cause, and UnidosUS (together, "Organizational Plaintiffs") conduct voter outreach that has already been disrupted by the Polling Place Policies, and represent members who are registered to vote and who are concerned and intimidated by the prospect of armed agents at polling places.

17. U.S. citizens may reasonably fear interactions with ICE. According to available reporting, in recent years, ICE has unlawfully detained more than 170 U.S. citizens.[5] American citizens peacefully exercising their First Amendment rights have been shot and killed by ICE.[6] And ICE agents frequently stop and question citizens—sometimes detaining them for days—based on racial profiling.[7]

18. Plaintiffs City and County of Denver, Colorado and Hennepin County, Minnesota (together, "Local Government Plaintiffs") administer local, state, and federal elections in their respective jurisdictions. They also operate the law enforcement agencies responsible for ensuring public safety and order including, if necessary, responding to disturbances or incidents at or near polling places.

19. The presence of federal force at the polls interferes with the smooth administration of elections at the local level. It disrupts voting and makes it more difficult for state and local

---

[5] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM; *see also Vasquez Perdomo v. Noem*, 148 F.4th 656 (9th Cir. 2025) (finding ICE agents had, in multiple instances, detained U.S. citizens by force, and in one instance, taking their Real ID and leaving them vulnerable to the next ICE agent to profile them).

[6] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

[7] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

election officials and law enforcement to do their jobs by making polling places and the areas around them spaces of confrontation.

20. Congress banned armed federal agents at election sites to provide and preserve free and fair elections, the rule of law, the right to vote, and Americans' confidence in the sanctity of the ballot box. Defendants' disregard for that statutory framework threatens our upcoming election and public safety.

21. Judicial review of the Polling Place Policies is appropriate now to declare that, except as narrowly provided by law under 18 U.S.C. § 592, the federal government may not send armed officers to polling sites, as that would violate the prohibition on federal "armed men" at election sites, intimidate voters and those who would urge or aid them to vote, and interfere with the conduct of a free and fair election. Defendants should not be permitted to cast the pall of federal force over the ballot box as we head to the polls in the coming days.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, specifically the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq*., and Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

23. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are agencies of the United States and officers or employees of those federal agencies who are sued in their official capacity. Further, at least one Defendant is headquartered in the District of Columbia, where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

### LULAC

24. Plaintiff League of United Latin American Citizens ("LULAC") is a nationwide, non-profit, non-partisan, membership-based organization with 359 councils (chapters) and 896,972 members nationwide. LULAC was established in 1929 and is headquartered in Washington, D.C.

25. LULAC is the largest and oldest Latino civil rights membership and advocacy organization in the United States. Its mission is to improve the lives of Latino families throughout the United States and to protect their civil rights through community-based programs in each of its 359 councils.

26. LULAC's members include both U.S. born citizens and naturalized citizens. Its members are civically engaged: approximately 83% are registered to vote, nearly 76% of LULAC's registered members voted in 2020, and around 62% voted in 2022, exceeding the voting rates of the general population.

27. Throughout the year, LULAC's members, working through its councils, register prospective voters and hold voter registration drives at naturalization ceremonies, schools, churches, and other community events. At these events, LULAC members, working through its councils, often, at the request of registrants, collect voter registration forms and return them to local election offices in accordance with state law. LULAC holds get-out-the-vote programs before elections to encourage its members to vote.

### Common Cause

28. Plaintiff Common Cause is a nonpartisan, grassroots organization organized under the laws of the District of Columbia with a mission to uphold the core values of American democracy. Common Cause works to create open, honest, and accountable government that serves

the public interest; to promote equal rights, opportunity, and representation for all; and to empower all people to make their voices heard in the political process. Common Cause has nearly one million members, twenty-two state offices, and a presence in all fifty states and the District of Columbia. It has members in every congressional district. Since John Gardner, a Republican and cabinet secretary in the Johnson administration, founded it more than fifty-five years ago, Common Cause has worked to make government at all levels more representative, open, and responsive to the interests of everyday people.

29. Plaintiff Common Cause Education Fund (the "Education Fund") was formed in 2000 as a nonprofit under the laws of the State of Delaware. The Education Fund provides education, engagement, and research to Common Cause members, constituents, partner organizations, and the public about voter registration and the electoral process. The Education Fund works to create public engagement on democracy issues and to promote effective citizen participation, which is critical for a healthy and robust democratic society.

30. Common Cause and the Common Cause Education Fund (together, "Common Cause") bring this action jointly and on behalf of its members. Common Cause mobilizes voters to participate in the electoral process. It runs programs that assist and protect them when they do, because voters' free and fair ability to cast a ballot is essential to self-government and to deciding the country's future.

31. A member of Common Cause is any individual who, within the preceding twenty-four months, has either made a financial contribution to Common Cause or the Common Cause Education Fund, or taken meaningful action with Common Cause or the Common Cause Education Fund in furtherance of the organizations' mission, including signing a petition, contacting an elected official through Common Cause platforms, registering to vote through

Common Cause programs, volunteering, participating in a training or organizing event, or otherwise engaging in advocacy actions organized by Common Cause or the Common Cause Education Fund.

32. Common Cause's members include registered voters in every state and the District of Columbia, U.S.-born citizens, naturalized citizens, citizens in mixed-status families, and people who serve as poll monitors, poll workers, interpreters, voter registration volunteers, and drivers who take voters to the polls.

**UnidosUS**

33. Plaintiff UnidosUS is a nonprofit, nonpartisan organization headquartered in Washington, D.C.

34. UnidosUS is the nation's largest Hispanic civil rights and advocacy organization with nearly 300 affiliates nationwide. Its mission is to build a stronger America by creating opportunities for Latinos. Through advocacy, research, and a network of nearly 300 community-based Affiliates across all fifty states, the District of Columbia, and Puerto Rico, UnidosUS works to expand economic opportunity, strengthen civic participation, and promote the social and political advancement of Latino communities. Since 1968, UnidosUS has challenged barriers that limit the ability of Latinos to fully participate in American civic and economic life.

35. Among its core activities, UnidosUS has for many years conducted nonpartisan voter outreach to encourage eligible Latino citizens to register and to prepare to vote. In the 2026 election cycle, as part of get-out-the-vote activities, UnidosUS anticipates that its staff and nationwide network of volunteers will contact approximately 300,000 registered Latino voters through in-person, telephonic, and digital means. This voter outreach program provides eligible Latino voters information about registration, checking their registration status, and making a plan to vote, including providing details about polling locations and hours of operations, identification

requirements, and what to expect when voting. The purpose of that outreach is to ensure eligible Hispanics are registered and prepared to cast a ballot.

**City and County of Denver, Colorado**

36. Plaintiff City and County of Denver ("Denver") is a home rule municipality organized and existing under the laws of the State of Colorado. It is the capital city of Colorado and the largest city in the state, with a population of 715,522 according to 2020 census data.

37. The Denver Clerk and Recorder is an independently elected official for Denver. Under Denver's charter and the state's Uniform Election Code, the Clerk and Recorder is the designated election official for Denver and is responsible for administering elections. The Clerk and Recorder manages voter registration for the county in the state voter registration database, plans and coordinates local, state, and federal elections, prepares, certifies, and distributes ballots, manages 24-hour drop boxes and Voter Service and Polling Centers across the city and county, educates the public on voting procedures and practices, and tabulates and certifies election results.

38. As part of the planning and coordinating for elections, the Clerk and Recorder conducts training for election judges and staff, and prepares public messaging for voters.

**Hennepin County, Minnesota**

39. Plaintiff Hennepin County, Minnesota ("Hennepin County") is a political subdivision of the State of Minnesota and is the largest county in the State, with a population of 1,281,565, according to 2020 census data. Hennepin County is home to 45 cities, including Minneapolis, Bloomington, and Brooklyn Park.

40. Minnesota law assigns responsibility for many aspects of election administration to counties like Hennepin. Counties work hand-in-hand with the Minnesota Office of the Secretary of State and municipal clerks to cover all aspects of election administration. Hennepin County, acting through the Hennepin County Elections Department, is responsible for administering

elections in Hennepin County and serves as a central authority to assist cities in Hennepin County with election tasks assigned to municipal clerks.

41. The Hennepin County Elections Director is a position appointed by the Hennepin County Board of Commissioners. The position reports to the County Auditor and is a Deputy County Auditor. Minnesota statute provides the County Auditor is the chief election official for a county. The Hennepin County Auditor delegates day-to-day operation of the Hennepin County Elections Department to the Elections Director.

42. Among the duties Minnesota law commits to the County are the processing of voter registration applications, Minn. Stat. § 201.091; the printing of ballots, Minn. Stat. § 206.61; the maintaining of voter rolls, Minn. Stat. §§ 201.016, 201.021 to .022, 201.061, 201.081, 201.091, 201.096, 201.11 to .14, 201.161 to .1611, 201.171; the purchasing and maintaining of election equipment, Minn. Stat. §§ 206.58 to .59, 206.805, 206.82; the training of city, township, and school district election officials, Minn. Stat. § 204B.25; the compiling of election results, Minn. Stat. § 204C.33; and the conducting of post-election audits, Minn. Stat. § 206.89.

**Defendants**

43. Defendant U.S. Department of Homeland Security is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

44. Defendant Markwayne Mullin is the Secretary of Homeland Security and is sued in his official capacity.

45. Defendant U.S. Immigrations and Customs Enforcement is a federal enforcement agency housed under Defendant DHS and headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

46. Defendant David Venturella is the acting director of U.S. Immigration and Customs Enforcement and is sued in his official capacity.

47. Defendant U.S. Department of Justice is a federal agency headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

48. Defendant Todd Blanche is the Attorney General and is sued in his official capacity.

49. Defendant Federal Bureau of Investigation is a federal enforcement agency housed under Defendant DOJ and headquartered in Washington, D.C. It is an agency within the meaning of the Administrative Procedure Act, 5 U.S.C. § 551(1).

50. Defendant Kash Patel is the Director of the Federal Bureau of Investigation and is sued in his official capacity.

## LEGAL FRAMEWORK

51. 18 U.S.C. § 592 provides:

> Whoever, being an officer of the Army or Navy, or other person in the civil, military, or naval service of the United States, orders, brings, keeps, or has under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States, shall be fined under this title or imprisoned not more than five years, or both; and be disqualified from holding any office of honor, profit, or trust under the United States.

52. This provision reflects congressional concern about the corrosive effect of involving armed federal officers in elections—on both the integrity of our elections and the political neutrality of the military and law enforcement.

53. The bill's sponsor stated that its primary object was to protect "the freedom of the elective franchise," prescribing "punishments for certain persons engaged in the public service

who shall in any way interfere with the freedom of election." Cong. Globe, 38th Cong., Sess. 1, Vol. 1, at 101 (Jan. 6, 1864) (statement of Sen. Powell), https://perma.cc/D2B2-7ZUV.

54. As originally enacted, the statute contained *two* exceptions, prohibiting troops or "armed men" at polling places "unless it shall be necessary to repel the armed enemies of the United States, or to keep the peace at the polls." Pub. L. No. 38-52, ch. LII, 13 Stat. 437 (1865). However, in 1909, Congress specifically *repealed* the exception allowing federal troops or "armed men" to "keep the peace at the polls." Pub. L. No. 350, ch. 321, 35 Stat. 1088, 1092–93 (1909). Other than recodification and technical amendments, the statute has stood in its present form since then. Congress thus specifically excised federal officers' authority to "keep the peace," and squarely limited it to repelling armed enemies. Consistent with state and local authority to "regulate conduct in and around the polls in order to maintain peace [and] order," *Burson v. Freeman*, 504 U.S. 191, 193 (1992) (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)), it is local law enforcement that is responsible for keeping the peace at polling places.

55. The Administrative Procedure Act ("APA") holds executive agencies accountable to the rule of law and gives Americans redress when federal agencies take action or make policy that is arbitrary or capricious or contrary to law. 5 U.S.C. § 702, *et seq*.

56. Shortly after the conclusion of World War II and to account for the expanded powers granted to the executive branch under the New Deal, Congress passed the APA, which prohibits federal agencies from taking action that is "arbitrary, capricious, an abuse of discretion, . . . contrary to constitutional right, power, privilege, or immunity . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . without observance of procedure required by law . . . unsupported by substantial evidence . . . [or] unwarranted by the facts." 5 U.S.C. § 706(2).

57. The Act gives federal courts the power to hold agencies in check when they make unreasoned, unreasonable, or unlawful decisions: when agencies take such action, it must be held "unlawful and set aside." *Id.*

58. The Act's careful balance of executive power with democratic accountability was the result of ten years of deliberation and was considered to be a reflection of the "the nation's decision to permit extensive government, but to avoid dictatorship and central planning."[8]

## FACTUAL ALLEGATIONS

### I. Defendant Mullin clarifies DHS's policy of ICE officers at the polls.

59. All American States and territories will conduct a federal midterm election over the next two months, and many will also hold state or local elections. The election begins in some states with early voting as soon as September 18, 2026, and culminates in Election Day on November 3, 2026.

60. On September 1, 2026, Defendant Mullin stated that the Department of Homeland Security authorizes ICE officers to go to polling places under the DHS Polling Place Policy. He indicated that ICE agents have authority to go to polling sites for two distinct purposes:

> The only reason why we would be at polling places is if there is a threat to that polling place or we're serving a warrant on someone that we have been actively tracking down. . . . ICE's job is immigration, customs enforcement. That's their job . . . if we're serving a warrant we will be where we need to be.[9]

61. When ICE agents respond to threats or execute federal warrants, they are armed within the meaning of 18 U.S.C. § 592. ICE agents are authorized and expected to carry firearms

---

[8] George B. Shepherd, *Fierce Compromise: The Administrative Procedure Act Emerges from New Deal Politics*, 90 Nw. U. L. Rev. 1557, 1559 (1996).

[9] Eric Bazail-Eimil, *Mullin says DHS could deploy to polling sites for 'specific' threats, arrests*, POLITICO (Sep. 1, 2026), https://perma.cc/N2VN-HCYJ.

in the performance of their official duties, including when they respond to threats or execute federal warrants. *See* 8 C.F.R. § 287.5(f).

62. When asked for more clarity on Mullin's comments, DHS said in a statement that:

> ICE conducts intelligence-driven targeted enforcement, and if an active public safety threat endangered a polling location, they may be arrested as a result of that targeted enforcement action.[10]

63. DHS Defendants have thus confirmed their adoption of a policy of authorizing armed ICE officers to go to polling places to police "threats" and to conduct routine immigration and customs enforcement.

64. On September 13, 2026, in response to this lawsuit, White House Border Czar (and former acting ICE Director) Tom Homan was asked by Fox News whether there is "any truth" to "reporting that ICE is going to be raiding polling places":

> Homan: "Look, I have not seen any operational plans or any discussions on any immigration enforcement operation at polling places. . . . This is another attack on ICE and this administration. . . . What have they got to hide to begin with? Right? But there is no plan for immigration enforcement action at polling places, it's just another attempt to smear ICE and smear the President. . . . And we've seen, look we know illegal aliens have voted. I mean, we saw what just happened in New Jersey. Mikie Sherrill, [unintelligible] nothing to do with it, but a lot of illegal aliens on the voter rolls. So look, everybody wants fair elections, elections need to have some integrity. So the bottom line is, is, you know, the Trump administration, President Trump wants fair elections. But, I, I want to put that to bed. There's no plan to sweep polling places looking for illegal aliens."
>
> Fox News: ". . . They're citing this civil war era law that prohibits bringing troops to places, or 'armed men,' that's the law language, to places where are elections are held. **There will be people who even hear your answer there, and say, well, just the threat of it, the idea of it is enough to keep people in fear. Can you say whether there's been an order for people to stay, for enforcement to stay away from those locations?"**
>
> Homan: "Well, this, this is the same, Jackie, this is the same thing that [unintelligible], the continuation of lies that, you know, and I challenged them for the last two years where they say that ICE is operating in schools, or operating in

---

[10] *Id.*

> churches, or operating in hospitals. . . . **So ICE, look, there is no sensitive location policy, there is no sanctuary for a significant public safety threat or a national security threat. We'll go where we gotta go to apprehend these people.** But ICE are professionals. They try to do things in a professional manner. And not one, now we're arresting people that may have went to church or may have went to the hospital, but we don't do operations at those locations. **If you're a criminal alien, you're a national security threat, there's no sanctuary.** But look at the past two years. Not one instance of ICE operating at a sensitive location. To include polling places."[11]

65. On September 15, 2026, Defendant Patel stated in sworn testimony before the Senate Committee on the Judiciary that the FBI likewise had adopted a policy of authorizing armed agents to go to polling places for enforcement operations. Senator Peter Welch asked whether it was true that the FBI would have a presence at polling places leading up to Election Day, and the following exchange ensued:

> Patel: "We have an election crimes community coordinator in all 56 field offices so you bet we're gonna have them there and manning the post for election interference matters."
>
> Welch: "Wait, I thought you weren't going to be sending people to the polls?"
>
> Patel: "When did you hear that? It's just another lie."
>
> Welch: "When you answered [Senator Richard] Blumenthal."
>
> Patel: "Nope."
>
> Welch: "So you are sending FBI agents to the polls."
>
> Patel: "We have election crisis coordinators manned at all 56 field offices. Election integrity is of paramount importance. This FBI is not gonna shy away from that effort." [12]

---

[11] *Tom Homan reacts to Denver lawsuit seeking to block ICE at poll*, at 01:04 – 03:53 (Fox News, aired Sep. 13, 2026), https://www.foxnews.com/video/6405008680112 (emphases added).

[12] U.S. Senate Committee on the Judiciary, *Oversight Hearing: Oversight of the Federal Bureau of Investigation* (Sep. 15, 2026) https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-09-15-2026; *see also* Reuters, *LIVE: FBI Director Kash Patel testifies at US Senate hearing*, at 2:21:03 – 2:21:35 (YouTube, Sep. 16, 2026), https://www.youtube.com/live/36W3fhIB4Bs?t=8434s.

66. DHS Defendants did not engage in a rational or reasoned process before enacting and announcing their Polling Place Policy. Neither did DOJ Defendants. There is no indication that either set of Defendants considered any evidence or testimony regarding the effect of authorizing armed officers to enter polling places on the integrity of our elections, states' ability to conduct them in a free and fair manner, or the fears of voters and election workers about being confronted by federal force at the polls.

67. Even if voter fraud were widespread (it is not), Defendants entirely failed to consider that investigating potential voter fraud does not require armed agents at polling places during an ongoing election, any more than investigating potential jury tampering requires stationing armed agents in the jury room during deliberations.

## II. The Trump-Vance administration has been preparing and acting on the Polling Place Policies for months.

68. The Constitution gives the states and Congress—not the President—the power to regulate elections. "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4. Thus, the States, "as recognized administrator[s] of elections," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), are "invest[ed] . . . with responsibility for the mechanics of congressional elections"—so long "as Congress declines to pre-empt state legislative choices." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (citation omitted).

69. But over the past year, Defendants have made clear through public statements and civil immigration enforcement activity that they have adopted a set of policies that authorize armed federal law enforcement officers to go to polling places in violation of federal law and to interfere

with state election administration in the process, arrogating to the Executive branch a power reserved for the states and for Congress.

70. The administration developed and began implementing the Polling Place Policies over the past several months, while simultaneously disclaiming the existence of any such policy. But Defendant Mullin and Defendant Patel's statements have confirmed what was apparent from the actions and statements of the administration to date: DHS and DOJ Defendants have adopted a policy that authorizes armed agents to go to the polls.

71. On February 3, 2026, former Trump advisor and chief strategist Steve Bannon, in response to statements by President Trump that "Republicans ought to nationalize the voting," said, "We're going to have ICE surround the polls come November. We're not going to sit here and allow you to steal the country again. . . . President Trump has to nationalize the election."[13]

72. On February 5, 2026, when asked whether ICE agents would be sent to polling locations, White House Press Secretary Karoline Leavitt said that she "can't guarantee that an ICE agent won't be around a polling location in November."[14]

73. In March 2026, then-Deputy Attorney General Todd Blanche made clear that the Trump-Vance administration would disregard federal law prohibiting armed federal agents from entering polling places when, in comments to the Conservative Political Action Conference, he stated, "Why is there objection to sending ICE officers to polling places?"[15]

---

[13] Jacob Wendler, *Steve Bannon calls for Trump to deploy ICE and military troops to polling sites*, POLITICO (Feb. 4, 2026), https://perma.cc/E2UV-VUTH (internal quotation marks omitted).

[14] Andrew Feinberg, *White House's chilling warning about midterm elections: 'Can't guarantee an ICE agent won't be around polling locations'*, The Independent (Feb. 5, 2026), https://perma.cc/R499-CRS5.

[15] Forbes Breaking News, *WATCH: Deputy AG Todd Blanche Calls To Deploy ICE Agents To Polling Sites*, at 01:42–01:47 (YouTube, Mar. 27, 2026), https://www.youtube.com/watch?v=6Km1Zvo8bDw; Rebecca Beitsch, *Blanche: 'Why is there*

74. By June, the Justice Department had removed from its website a longstanding, publicly available manual that clearly stated that federal agents cannot lawfully conduct law enforcement activities at a polling place.[16] The deleted manual stated that "the federal prosecutor has no authority to send FBI Special Agents or Deputy U.S. Marshals to polling places. In fact, a federal statute makes it a felony for any federal official to send 'armed men' to the vicinity of open polling places." It continued, "[t]he effect of [Section 592] is to prohibit FBI Special Agents from conducting investigations within the polls on election day" and that its prohibition applies generally to "agents of the United States Government."[17]

75. At the same time, the Justice Department has gutted the Public Integrity Section ("PIN"), which drafted the manual.[18] Previously, PIN organized an Election Day command center to provide real-time legal advice to law enforcement in the field consistent with the manual; this administration appears poised to end that traditional practice.[19]

76. On March 9, 2026, nine Secretaries of State wrote to Defendant Mullin, asking him to confirm that there would not be ICE officers at polling places.[20]

---

*objection to sending ICE officers to polling places?*', The Hill (Mar. 27, 2026), https://perma.cc/K6VF-3EQB; Jacob Knutson, *Deputy attorney general endorses sending ICE agents to voting sites*, Democracy Docket (Mar. 26, 2026), https://perma.cc/UKZ5-ZNE8.

[16] Letter from Sen. Alex Padilla et al. to Todd Blanche, Acting Att'y Gen. (June 8, 2026), https://perma.cc/YS5Z-X6JN; Office of Sen. Alex Padilla, *Padilla, Durbin, Whitehouse, Colleagues Sound Alarm on Trump Administration Use of Election Crimes Prosecutions to Interfere in Midterm Elections*, Press Release (June 8, 2026), https://perma.cc/9V3T-GZE7.

[17] Richard C. Pilger, *Federal Prosecution of Election Offenses*, GPO 9, 73 (8th ed. 2017), https://perma.cc/NU6K-R72C.

[18] Ryan J. Reilly, Sarah Fitzpatrick & David Rohde, *Justice Department office that prosecutes public corruption slashed in size, sources say*, NBC News (Mar. 11, 2025), https://perma.cc/K3W9-NTFN.

[19] Jose Pagliery, *The Justice Department Hasn't Taken Its Usual Steps to Protect the 2026 Election*, NOTUS (June 8, 2026), https://perma.cc/3QQZ-5P3Q.

[20] Letter from Jena Griswold, Colo. Sec'y of State et al. to Markwayne Mullin, Acting Sec'y of Homeland Security (March 9, 2026), https://perma.cc/RH3X-XKVN.

77. In response, on May 11, 2026, then-Acting ICE Director Todd Lyons conceded that "there is no reason for ICE personnel to be deployed to polling places," while still insisting that ICE "plays an important role in investigating voter fraud and will continue to perform this vital mission."[21]

78. Despite this statement and Homan's claim that in the past two years there had been "not one" instance of ICE operating at polling places, ICE, at least, has in fact conducted multiple enforcement operations at polling places.

79. On May 20, 2026, armed ICE agents conducted an enforcement action at an active polling place in San Antonio, Texas where they "swarmed" the parking lot of the polling site to detain an individual in full view of voters before being directed to leave the premises by the county sheriff.[22]

80. On June 2, 2026, a "couple vehicles worth" of armed ICE agents visited an active polling place in Ventura County, California, during a "crush" of voters, as reported by local election officials and volunteers, who said, "It's very intimidating for someone exercising their right to vote."[23]

81. And on June 23, 2026, ICE agents entered an active polling place in Syracuse, New York, to accost an election volunteer. Reportedly, their purpose was to conduct investigative activity regarding a poll worker's social media post *five months earlier* about an ICE agent's

---

[21] Letter from Todd Lyons, Acting Dir. of ICE, to Jena Griswold, Colo. Sec'y of State (May 11, 2026), https://perma.cc/2S2T-NK9M.

[22] Michael Karlis, *ICE conducts enforcement action at San Antonio voting location, witnesses say*, San Antonio Current (May 20, 2026), https://perma.cc/Z7WT-JRGA.

[23] Wes Woods II, *UPDATED: ICE presence outside Simi Valley vote center raises alarms*, Ventura County Star (June 2, 2026), https://perma.cc/65UZ-XUEA.

shooting of Renee Good in Minneapolis—but they waited until the individual was midway through a shift at a polling place before choosing to confront her.[24]

82. On October 5, 2026, the first day ballot drop boxes opened in California, ICE detained an individual at a parking lot at Allan Hancock College in Santa Maria, California.[25] In the same parking area, an adjoining lot[26] at the college serves as an active area ballot drop off location.[27] Voters must pass through the area ICE was operating in order to access it.[28]

83. According to DHS documents secured by a Freedom of Information Act request and reported in the New York Times, around the same time as the enforcement action at an active polling site in San Antonio, ICE distributed internal talking points under the heading "Hot Topic 14 – ICE's Role in Elections and at Polling Facilities."[29]

84. ICE's heavily-redacted internal talking points, labeled "Hot Topic 14 – ICE's Role in Elections and at Polling Facilities," state:

> **Background:** There have been multiple news stories and inquiries from Members regarding ICE's role in elections investigations. Members have also asked if ICE plans to deploy officers to polling locations during the upcoming mid-term elections.

---

[24] Jude Joffe-Block, *She posted about ICE. Five months later, DHS agents told her to take her post down*, NPR (June 26, 2026), https://perma.cc/M8JK-H79T.

[25] Ryan P. Cruz, *Officials Speak Out After ICE Surge Hits Santa Maria*, Santa Barbara Independent (Oct. 6, 2026), https://perma.cc/9YMK-Z484 (noting that the arrest happened at Parking Lot 2).

[26] *Santa Maria Campus*, Allan Hancock College, https://perma.cc/Z25E-N8NH (illustrating Parking Lot 2 and Parking Lot 3 adjoining as one continuous parking area).

[27] *Current Ballot Drop Box Locations by Area*, County of Santa Barbara Elections, https://perma.cc/VG8W-HRUZ?type=image (last visited Oct. 7, 2026) (noting the ballot drop off location at Parking Lot 3).

[28] *See Santa Maria Campus* (illustrating the entrance to the parking area from Bradley Road requires drivers to enter through Parking Lot 2 to access Parking Lot 3).

[29] Madeleine Ngo, Richard Fausset & Alexandra Berzon, *Trump Officials Ramp Up Investigations Into Voter Registration Groups*, N.Y. Times (Oct. 7, 2026), https://perma.cc/9HNM-5QPX (linking U.S. Immigration and Customs Enforcement, Response to ICE FOIA Case No. 2026-ICLI-00100, at 7 (Oct. 1, 2026), https://perma.cc/TEC2-V32Y).

**Value Statements:**

- There is no reason for ICE officers and agents to be deployed to polling places, unless a threat arises.
- Homeland Security Investigations conducts investigations into voter fraud, for which we've made numerous arrests.

* * *

***If asked*: Will ICE arrest people at polling places? If you are ordered to send ICE personnel to polling places, will you comply with the order?**

[Redacted: **(b)(7)(E)**, large box][30]

85. On September 18, 2026, public reporting revealed that DHS personnel had, some time last year, "shared a 78-page document listing counties and states that offer election materials and ballots in non-English languages" alongside "a Department of Justice criminal checklist outlining requirements for prosecution of voter-related charges."[31] The list and associate prosecutorial checklist suggests that DHS is targeting polling locations for immigration enforcement based on the purported presence of voters who may benefit from materials in languages other than English.

86. Taken together, these actions indicate that DHS Defendants have developed and acted upon the DHS Polling Place Policy; and that DOJ Defendants have likewise adopted the DOJ Polling Place Policy as a matter of agency policy regarding authority to enter go to polling locations.

---

[30] *Id.*

[31] Miles Parks, Jude Joffe-Block, Ximena Bustillo, *A DHS email raises new questions about the Trump administration's election plans*, NPR (Sep. 18, 2026), https://perma.cc/ED68-9ZYE.

## III. The Polling Place Policies Intimidate Organizational Plaintiffs' Members and Interferes With Their Missions.

87. The fact that Defendants' Polling Place Policies are in direct conflict with federal law makes clear that ICE and FBI agents will conduct themselves as they see fit, without regard for the rule of law, placing voters and election workers alike in fear that their rights will be similarly disregarded if they encounter ICE or FBI agents at polling places during the upcoming election. And these policies suggest that DHS and DOJ may similarly authorize other enforcement components under their authority to go to polling places for purposes beyond that allowed by law.

88. That fear is well-founded—especially as regards ICE. ICE has repeatedly conducted enforcement operations in which they stop, seize, and interrogate people based on how they look, what language they speak, and where they work, rather than on individualized suspicion that a particular person lacks lawful status—making clear that U.S. citizenship is no bar to being detained and interrogated.

89. In *Vasquez Perdomo v. Noem*, the United States District Court for the Central District of California found that agents conducting "roving patrols" in the Los Angeles area were making stops on the basis of apparent race or ethnicity, spoken language or accent, and the type of work a person appeared to perform, and enjoined the practice. 790 F. Supp. 3d 850, 864, 890, 894 n.33 (C.D. Cal. 2025). The Ninth Circuit denied the government's motion for a stay pending appeal. 148 F.4th 656 (9th Cir. 2025).[32]

[32] The Supreme Court later stayed the district court's injunction. *Noem v. Vasquez Perdomo*, 600 U.S. __, 146 S. Ct. 1 (2025). Justice Kavanaugh, concurring, explained that the stay was granted on the basis that plaintiffs likely lacked standing to sustain a broad injunction, and that the government had a "fair prospect" of succeeding on its Fourth Amendment defense—but he did not question the veracity of the findings that ICE agents had detained U.S. citizens on the basis of apparent race or ethnicity. *Id.* at 1–4 (Kavanaugh, J., concurring).

90. In particular, the Ninth Circuit credited evidence that armed ICE agents had, on multiple occasions, detained U.S. citizens on the basis of their apparent race or ethnicity, throwing them against walls, telling them to "Shut the f*ck up," and demanding to know what hospital they had been born in. *Id.* at 667–70. In one instance, after ordering one citizen to present identification to prove his claim that he was an American, the agents, armed with "military-style rifles," took his phone, detained him for twenty minutes, and then released him—without ever returning the Real ID he had given them to prove his citizenship, leaving him vulnerable to the next "roving patrol." *Id.* at 667.

91. United States citizenship is thus no protection against the threat of being subjected to federal force and interrogated by armed ICE agents. An investigation by ProPublica identified more than 170 instances of ICE detaining U.S. citizens, where "Americans have been dragged, tackled, beaten, tased and shot by immigration agents."[33] More than 50 of those citizens—nearly all of them Latino—were held after agents questioned their citizenship.[34] And more than 20 were held for more than a day without being afforded the right to call a lawyer or their loved ones.[35]

92. A Pew Research Center poll published in November 2025 found that over a six-month period, five percent of Latinos surveyed had "been stopped by authorities and asked about their U.S. citizenship or immigration status"—a rate that remained the same for U.S.-born Latinos as for those who immigrated to the United States.[36]

---

[33] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[34] *Id.*

[35] *Id.*

[36] Carolyne Im & Luis Noé-Bustamante, *Latinos' Experiences with Immigration Enforcement in Trump's Second Term*, Pew Research Center (Nov. 24, 2025), https://perma.cc/QNK2-UABQ.

93. On March 5, 2025, in the course of a large-scale federal immigration enforcement operation in Northern Virginia, ICE officers surrounded the vehicle of Jensy Machado—a naturalized United States citizen and Manassas resident—with their weapons drawn. They ordered him from his vehicle, refused his offers to produce his REAL ID-compliant Virginia driver's license, handcuffed him, and questioned him about how he entered the country. Officers released him only after he was permitted to produce identification.[37]

94. The risk extends to anyone who tries to intervene to help individuals accosted or detained by ICE. ProPublica identified "about 130 Americans, including a dozen elected officials" who have been "accused of assaulting or impeding officers."[38]

95. ICE officers have wounded or killed multiple U.S. citizens who attempted to assist individuals accosted by ICE.[39]

96. DHS Defendants are using voter rolls to identify the individuals they are actively tracking down. ICE's own records show that, as of May 25, 2026, Homeland Security Investigations ("HSI") had ingested "50.6 million records" from DOJ voter data, and that those "[d]atasets are currently with iLab for secondary enrichment and identification of high-value targets."[40] ICE has described "ingesting processed voter roll data into the ELITE enforcement system to enhance lead management, analytical review, and investigative tracking."[41]

---

[37] Jackie Bensen, *'Just following Hispanic people': Citizen detained by ICE questions vote for Trump*, NBC Washington (Mar. 8, 2025), https://perma.cc/J9WR-QARU; Jackie Bensen, *Sen. Warner seeks answers on why ICE detained a US citizen in Manassas*, NBC Washington (Mar. 21, 2025), https://perma.cc/SWG5-N6QC.

[38] Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days.*, ProPublica (Oct. 16, 2025), https://perma.cc/8G3M-6GDM.

[39] Allison McCann, *At Least 23 People Have Been Shot at by Federal Immigration Agents Since Last Year*, N.Y. Times (July 16, 2026), https://perma.cc/A536-S6ZP.

[40] *See supra* note 29 (linking *Response to ICE FOIA Case No. 2026-ICLI-00100,* at 57).

[41] *Id*. (linking *Response to ICE FOIA Case No. 2026-ICLI-00100*, at 125).

97. Defendants' use of voter records to identify enforcement targets creates a substantial risk that armed agents will conduct enforcement at places where the 2026 general election is held.

98. The result is that as citizens go to the polls this fall, they are confronted by the possibility of armed force—agents carrying guns who may stop them based on how they look and what language they speak, detain them forcefully, interrogate them, and prevent them from seeking help.

99. Even citizens who are *not* specifically confronted by ICE agents may be intimidated from voting, or urging or assisting others to vote, by the presence of ICE agents at or near voting sites.

### A. The Polling Place Policy Intimidates LULAC's Members and Threatens Its Voter Engagement Mission.

100. Plaintiff LULAC represents members in every state in the union through its 359 local councils. LULAC has 896,972 members nationwide, of whom approximately 83% are registered to vote.

101. LULAC members have informed LULAC that they are worried immigration officers will be present at polling places, and that they are discouraged from turning out to vote because they fear being singled out on the basis of their appearance, accent, or surname.

102. At LULAC's annual legislative conference in Washington, D.C., on February 24, 2026, leadership heard from members and local community advocates about safety concerns and fear related to ICE targeting Latino individuals. Members voiced specific concerns about the upcoming election and whether ICE agents would be present at polling places, citing fear that they would be targeted for trying to exercise their right to vote.

103. At LULAC's annual national convening in Fort Worth, Texas, on June 17-20, 2026, members again expressed concern about ICE agents at the polls based on statements made by the Trump-Vance administration and reports of ICE agents in fact showing up at polls during primary voting. In particular, members indicated that they were concerned about the suppressing effect that armed ICE agents would have on voter turnout given the threat that ICE agents would appear at polls nationwide, across multiple states, rather than isolated city-specific instances.

104. LULAC has likewise heard from local council leadership by email and conference calls about local concerns related to members' willingness to participate in the upcoming election given their fears that ICE agents will be present.

105. In response, LULAC has created new know-your-rights trainings and educational campaigns to inform members about their rights if confronted by ICE, at the polls or elsewhere, and to train volunteers on how to educate others in their community and monitor such incidents. It has had to expend a significant amount of time and resources originally intended for get-out-the-vote efforts to instead respond to members' legitimate concerns regarding their safety and constitutional rights in advance of the upcoming election.

106. Those new materials include LULAC's 2026 guide, *Tu Voz. Tu Voto. Tus Derechos.: A Guide to Voting Rights and Election Protection*, which provides information about voting rights, election protection, and how to respond to potential interference or intimidation.

107. Since May 2026, five members of LULAC's national staff have spent over 700 hours on this work—developing materials, conducting trainings, coordinating with state and local leaders, responding to questions from members and partner organizations, and preparing for potential ICE activity at or near polling places—that would otherwise have been spent on ordinary voter assistance and get-out-the-vote programming.

108. Given the drain on resources required to address the Polling Place Policies, LULAC has had to scale back planned get-out-the-vote activities in ten communities, and completely cancel voter registration drives in five states.

109. On December 5-7, 2025, LULAC conducted a series of know-your-rights trainings across three cities in three days in Bend, Eugene, and Portland, Oregon, in response to community concerns arising out of ICE's operations in Portland in September to December 2025. LULAC partnered with the National Education Association and the Oregon Education Association, training 1,500 people regarding their civil and constitutional rights regarding interactions with ICE officials.

110. Over the last few months, LULAC developed a new Community Liaison Fellows ("CLF") program to ensure Latino voters in their region are informed about their civil rights, races and candidates, and early voting and Election Day deadlines and locations, for which LULAC has developed new trainings.[42] Because of persistent concerns about ICE at the polls, LULAC has been forced to include materials about how to respond to the presence of armed ICE officers at the polls and what voters' rights are in such a situation.

111. LULAC also plays a coordinating role among advocacy organizations, sharing training materials and ensuring efficient responses to community concerns across multiple organizations. Given the prevalence of concerns about ICE's enforcement operations, especially in light of the upcoming election, LULAC has had to spend significant time responding to organizations' concerns and distributing materials designed to allay concerns and help local organizers respond to community members' fears.

[42] *Community Liaison Fellows*, LULAC, https://perma.cc/83G6-L53W (last visited Sep. 8, 2026).

112. Many states offer multiple options for a voter to physically cast their vote, in addition to voting in-person on Election Day at local polling places. Depending on the state, these additional options include but are not limited to: early in-person voting, either at a central office or at satellite locations; mobile or curbside in-person voting (often for voters over 65, or voters with disabilities); or delivering mail ballots in-person to a secure ballot drop box.

113. These polling locations all constitute places where the 2026 general election is held under 18 U.S.C. § 592.

114. Early voting has already begun in several states, including where LULAC has members.

115. Early voting in other states where LULAC has members, including Maryland, Illinois, New Mexico, and Ohio, also begins in October.

116. As a result, the Polling Place Policies create a persistent threat to LULAC's members around the country as they make plans for voting and volunteering in the upcoming election.

117. This extended threat to its members will interfere with LULAC's get-out-the-vote mission, making it more difficult to conduct planned voter registration and get-out-the-vote programming, and forcing it to perform additional work through its Community Liaison Fellowship program and other know-your-rights trainings to educate its members about their legal rights and obligations when confronted by ICE agents in the run up to early voting and Election Day.

### B. The DHS Polling Place Policy Directly Interferes With Common Cause's Election Protection Mission.

#### *i. Common Cause's Election Protection and Voter Assistance Program*

118. Election Protection is Common Cause's national, nonpartisan voter assistance and voter protection program—one of the largest programs Common Cause runs. Common Cause recruits, trains, and deploys volunteers who monitor polling places and ballot drop boxes during early voting and on Election Day; answer voters' questions; provide language assistance; help voters who are turned away, sent to the wrong location, or told they are not on the rolls; and report problems to election officials so that they are fixed while voting is under way. Common Cause runs command centers that receive those reports and escalate them to election officials, volunteer attorneys, and state attorneys general; maintains year-round working relationships with state and county election officials; monitors changes in election procedures and helps voters navigate them; distributes palm cards and other materials that help voters understand their rights at the polls; and trains others to do the same.

119. Common Cause leads or co-leads statewide Election Protection programs in many of the states where it has staff, and works with multiple coalitions to advance pro-voter reforms and increase civic engagement, including the national Election Protection Coalition.

120. The program is already under way for the 2026 general election. Common Cause, in nearly two dozen states, is recruiting, training, and deploying thousands of poll monitors and ballot drop box monitors; hundreds of additional volunteers in de-escalation, peacekeeping, and command center roles; and volunteer attorneys who respond in the field. Poll monitor trainings are running or scheduled in every one of those states between August and October 2026. In Colorado alone, Common Cause recruited nearly 500 volunteers by late August. In North Carolina, Common Cause is holding "Ready to Vote" trainings in all 100 counties to help community and campus

leaders assist voters overcome barriers to voting. In Ohio, Common Cause is training volunteers to monitor polling places and county boards of elections so that provisional ballots are counted, and election procedures are followed.

***ii. Adverse Impacts to Common Cause's Programs and Members***

121. Common Cause's members and Election Protection volunteers live and vote in the communities where ICE has been active. Common Cause members have reported to Common Cause that they or someone in their family, neighborhood, or community has been affected by immigration enforcement activity. Common Cause members have reported that fear of immigration enforcement has caused them or people they know to avoid going to work, school, and the grocery store, taking walks in their neighborhoods, and participating in elections.

122. Common Cause members from across the country have told Common Cause that fear of ICE will change how they take part in the November 2026 election, including changing their method of voting and being less likely to volunteer as election monitors, less likely to serve as poll workers, less likely to volunteer to help register others to vote, and less likely to drive voters to the polls. At least one individual has specifically expressed that she is afraid to go to the polls because of ICE, and so plans to vote by mail instead. The Polling Place Policy tells Common Cause members that armed ICE officers may be inside or near the polling place when they arrive to vote, interpret for a neighbor, or help a voter who has been turned away.

123. Common Cause volunteers have observed federal immigration enforcement at and near polling places and its effect on voters, volunteers, and election officials.

124. In Florida, a Common Cause poll monitor observed a checkpoint in a jurisdiction with a Section 287(g) agreement approximately one mile from a polling location and an armed guard in paramilitary gear at the door of a polling location in Lee County, in a Latino neighborhood. This created a reasonable fear that federal ICE agents will operate at election sites.

125. In New York, where armed ICE agents entered an active polling place in Syracuse on June 23, 2026, *see supra* ¶ 81, Asian-language-speaking translators told Common Cause that they feared providing translation services at the polls. Common Cause has had to expend more resources towards recruiting Election Protection volunteers for the upcoming election.

126. In Colorado, at least one county sheriffs' office conducts warrant checks at polling locations and cooperate with ICE. This raises fears for Common Cause members in such counties, as voters from mixed-status households may not know if a deputy is there to keep order or to share information with ICE. In March 2026, Colorado's Secretary of State asked Defendants to confirm that ICE officers would not be present at polling places, but they did not provide that assurance. *See supra* ¶¶ 76–77.

127. As a result of these uncertainties and threats, a Common Cause member and volunteer in New York, for example, is concerned about her ability to carry out normal election monitoring because her attention may be diverted to observing federal agents.

128. Defendants' Polling Place Policy, and the statements and enforcement actions through which Defendants developed it, *see supra* ¶¶ 70–81, have forced Common Cause to undertake programmatic activities it would not otherwise have undertaken, and to redirect staff time, volunteer time, and money from assisting voters and monitoring polling places to preparing voters and volunteers for encounters with armed federal agents. Those activities include the following.

129. In Texas, Common Cause developed a "Voting & Immigration Presentation," a "Vote Safe from ICE in Texas Toolkit," and an explainer titled "Vote Safe from ICE in Texas." They began delivering the training to voters and volunteers in February 2026 at Trinity University in San Antonio. For the general election, Common Cause is recruiting and training hundreds of

safety monitors to work alongside hundreds of poll monitors and volunteer attorneys, has scheduled three dedicated safety-monitor trainings on September 23, October 10, and October 20, and is adding de-escalation training for volunteers, none of which the program included before.

130. In Florida, after the Lee County observation described above, Common Cause held a training for volunteer poll monitors on what to do if they encounter ICE at the polls and on how observers can peacefully exercise their First Amendment right to document what they see; added a section on immigration enforcement to the Florida poll monitor training; is developing a "Vote Safe from ICE" resource for Florida based on the Texas materials; and is sending letters to election officials and sheriffs about immigration enforcement at the polls.

131. In New York, because members and Election Protection volunteers expressed fear of ICE at the polls, Common Cause added an immigration enforcement monitoring component to the Election Protection program, participated in and supported related trainings, and now coordinates with immigration advocates to identify polling places at risk. Common Cause drafted procedures to ensure voters' safety and confidence in case of a report of federal agents at a polling place and is recruiting hundreds of clergy to serve as de-escalation volunteers and peacekeepers at the polls. Common Cause also redirected staff time and member time to state legislation concerning federal enforcement at polling places.

132. In Georgia, Common Cause is training poll observers to document in detail any federal law enforcement presence at polling locations; is training observers on end-of-day shifts to remain an extra hour after the polls close to ensure the security of ballots; and is working on a campaign encouraging voters to vote early in person, so that Common Cause observers can assist voters who are intimidated by ICE presence at a polling location and direct them to the nearest polling location confirmed to be free of that presence. Common Cause also facilitated three

community conversations at which residents learned their rights from an immigration and criminal defense perspective and received Know Your Rights cards explaining the difference between a judicial warrant and an administrative order; coordinated legal clinics for families affected by the immigration raid at the Hyundai plant; and coordinated a meeting with the Gwinnett County Sheriff about his office's cooperation with ICE, followed by a press conference and a letter campaign opposing a Section 287(g) agreement in Gwinnett County.

133. In Maryland, Common Cause is working with immigration enforcement monitoring groups that can alert them to federal agents near polling places so that Common Cause can notify the State Board of Elections, which coordinates with state and local officials; is developing a rapid crisis response protocol for federal agents interfering in elections; is planning protocols regarding federal agents at polling places; and plans, where it is safe, to send additional volunteers to assist voters to exercise their rights and help them enter polling places. Because of Defendant's Polling Place Policy, Common Cause has prioritized Prince George's County, Baltimore City, and Montgomery County, home to a large population of new Americans, for the hundreds of poll monitors it is deploying.

134. In California, Common Cause is conducting Know Your Rights trainings and webinars to help voters understand their rights if they encounter federal agents during the election period; added the subject to Election Protection trainings for Common Cause members; and presented to elected officials at shadow hearings in April 2026 on federal agency deployments in California and during elections.

135. In Arizona, Common Cause is training Election Protection volunteers to redirect voters to safer locations when harassment occurs and to identify polling locations by their

proximity to ICE offices and staging locations, so that the hundreds of poll monitors Common Cause is deploying on Election Day can be placed where voters most need assistance.

136. In Colorado, Common Cause is directing recruitment and poll monitoring to voters at risk of ICE enforcement encounters, including voters in mixed-status households, and to localities with increased ICE presence; added ICE facilities to the map used to plan poll monitoring; opened a line of communication with the state's ICE response network; will re-train poll monitors and issue advisories regarding federal law enforcement activity near voting sites; and will hire an outside practitioner to provide de-escalation and safety training that Common Cause cannot provide itself.

137. In Minnesota, Common Cause brought the state's grassroots immigrant rapid response organizations into its Election Protection program so that reports of ICE or federal agents near polling places can be verified and answered in real time on Election Day, and is funding organizations in several counties to help voters who are too afraid to vote in person make a plan to vote early or by mail.

138. In North Carolina, Common Cause is partnering with immigrant rights organizations to recruit volunteers for trained verifier and de-escalation programs that expand the existing poll presence program; broadening the network of "safe sites" in and around early voting sites and Election Day precincts; supporting Spanish-language media with voter guide updates and access to Know Your Rights trainings; directing canvass monitoring and poll presence to the places where ICE or military deployments would do the most harm; and recruiting legal monitors to provide legal defense for affected voters.

139. In Oregon, where voting is by mail, Common Cause now recruits, trains, and manages a team of hundreds of ballot drop box monitors across nearly a dozen counties with higher levels of ICE activity, and is working with other programs to address ICE activity at drop boxes.

140. In Rhode Island, Common Cause added guidance on immigration enforcement to poll monitor training, added questions to monitors' checklists, is recruiting bilingual monitors for counties with higher immigrant populations, and is monitoring the Board of Elections' implementation of a new state law restricting ICE at the polls.

141. In Indiana, Common Cause is expanding de-escalation training for poll monitors, recruiting hundreds of de-escalation volunteers, and conducting outreach in immigrant communities.

142. In New Mexico and Nebraska, Common Cause is preparing volunteers and election officials to respond to federal law enforcement near polling locations and to assist voters with their rights if agents appear.

143. Each of these activities draws on staff time, volunteer time, and money that Common Cause would otherwise spend encouraging voters to vote, assisting voters at the polls, and monitoring compliance with election procedures.

144. Defendants' Polling Place Policies also make it harder for Common Cause to recruit volunteers its programs depend on; requires Common Cause to train volunteers for encounters with armed federal law enforcement rather than for the voter assistance the program exists to provide; and forces Common Cause to spend resources on workarounds, such as helping voters vote early or by mail to avoid the polls, that reduce rather than expand in-person participation.

145. Already, Common Cause members have dropped out of election protection training and volunteering with Common Cause out of fear that they would not be able to cope if ICE showed up.

146. Defendants' Polling Place Policies intimidates Common Cause members from voting, as they have voted in past elections. In particular, members who are naturalized citizens or who are perceived to be foreign-born now face the prospect of interrogation, detention, or family separation as the price of casting a ballot in person or of helping a neighbor to do so.

147. The interests Common Cause seeks to protect in this action are germane to its purpose: Common Cause exists to empower people to make their voices heard in the political process and to protect every eligible voter's freedom to cast a ballot without fear. Neither the claims asserted nor the declaratory and injunctive relief requested requires the participation of individual Common Cause members.

**C. The Polling Place Policies Interfere with UnidosUS's Voter Outreach.**

148. The Polling Place Policies have directly interfered with the delivery of the voter outreach program that is central to the mission and work of UnidosUS. *See supra* ¶ 35. Voters concerned about stories of ICE at polling centers now ask whether they may encounter armed federal immigration officers at their polling place. As a result, UnidosUS staff must address that subject in the course of outreach—time that would otherwise be devoted to registration and voting preparation.

149. During outreach calls, text-message exchanges, community meetings, Affiliate convenings, and voter education events, voters have asked whether armed Immigration and Customs Enforcement officers may be present at polling places, whether they could be stopped, questioned, or detained while traveling to or from a polling location, and what protections exist if federal immigration officers appear at or near a polling place.

150. UnidosUS's outreach capacity is finite. Each contact occupies a fixed amount of staff time and investment. Time and resources spent addressing the prospect of armed federal officers at polling places is time and resources not spent reaching additional voters. The direct and predictable consequence is that UnidosUS reaches fewer voters than it otherwise would, and that the voters it does reach receive less of the registration and preparation assistance the program exists to provide.

151. UnidosUS is about to launch a multi-layered voter education campaign encompassing phone calls, text messaging, terrestrial radio and streaming audio ads, and digital ads. Increasing time and message space devoted to addressing the prospect of armed federal officers at polling places necessarily displaces other content on registration and voting-preparation within that campaign. The effect of the Polling Place Policies is that UnidosUS will deliver less of the assistance the campaign is designed to provide to fewer voters, than it would absent the Policy.

152. Specifically, UnidosUS has reserved approximately $121,000 in voter-mobilization and voter-education program funds that otherwise would have been committed to planned activities in order to maintain the capacity for rapid-response communications and programmatic changes, including new digital advertising, phone outreach, and social-media communications, should developments relating to immigration-enforcement activity at polling places require an immediate response. That work includes a voter guide entitled "Vote Safely in 2026."

153. Based on UnidosUS's current voter-contact costs, the $121,000 it has set aside to build and maintain capacity to address the impacts of the Polling Place Policies would otherwise have supported outreach to approximately 19,200 additional voters.

154. Multiple staff members who otherwise would devote their time to voter registration, voting plans, polling-place information, voter-identification requirements, and election procedures

now spend substantial time responding to concerns regarding immigration-enforcement activity and explaining available voter protections.

155. Separately, for the 2026 cycle UnidosUS is recruiting and training voter protection navigators drawn from its Affiliate network, planning to recruit and train approximately 40 navigators across 14 states. Navigators provide assistance to voters during early voting and on Election Day, helping them troubleshoot any issues and connect voters with Election Protection hotlines or lawyers where necessary. Navigator recruitment and training are activities UnidosUS conducts itself and funds from its own resources. The training curriculum addresses, among other subjects, the prospect of armed federal officers at polling places.

156. The Polling Place Policies have also interfered with UnidosUS's navigator program. The prospect of armed federal officers at polling places has discouraged prospective navigators from enrolling in and completing training. Multiple organizations invited to join the navigator training program declined to participate, citing the hostile operating environment, including the prospect of armed federal agents at polling places. That falloff is the predictable effect of the Polling Place Policy on the decisions of the individuals UnidosUS seeks to recruit. Now, rather than training navigators to help overcome barriers and gaps related to voter registration, ballot access, and election procedures, UnidosUS must train navigators to dedicate time and effort to addressing voters' safety and security concerns at polling places, what protections will be in place to protect voters from voter intimidation, and the proper steps to take should a voter be confronted by an armed federal agent at a polling place.

157. UnidosUS has also experienced difficulty recruiting and re-engaging volunteer canvassers at levels comparable to previous election cycles. Former and prospective volunteers

have expressed concerns about possible encounters with federal immigration officers while participating in voter-outreach activities.

158. Absent the Polling Place Policies, UnidosUS would reach more voters with basic and traditional registration and preparation assistance, would devote its outreach contacts to that assistance rather than to the prospect of armed federal officers, and would recruit and train its planned complement of navigators without the resources required to address the Policy.

## IV. The Polling Place Policies Interfere With Local Government Plaintiffs' Election Administration and Law Enforcement.

159. The threatened presence of armed federal agents at polling places during the upcoming election is making it more difficult for local governments to administer the election and will interfere with local law enforcement's ability to do their jobs.

160. The Polling Place Policies have interfered with local governments' election administration responsibilities, costing time and money. Already, local governments have been forced to spend time and money responding to the Polling Place Policies, crafting new trainings for election workers, planning responses in the event of federal enforcement operations at polling sites, and even designating contingency alternate polling locations. And the election workers and volunteers these governments employ, like voters themselves, are rightfully intimidated by the risk of armed agents where they work.

161. The Policies also impede local law enforcement by making it more difficult for local police to ensure the security of election sites. ICE presence disrupts orderly administration of elections and could divert or impede law enforcement response to other incidents. Confusion over who has ultimate authority in the event of a dispute makes it hard for local officers to maintain the trust necessary to effectively serve their communities.

### A. Denver, Colorado

162. Plaintiff City and County of Denver, by and through the Denver Clerk and Recorder ("Clerk"), is responsible for administering all aspects of federal, state, and local elections for the jurisdiction. Colo. Rev. Stat. § 1-1-110 (2026); Colo. Const. art. XX, § 6; Charter of the City and County of Denver, § 8.1.2 (E) (2026).

163. Exercising the authority granted to states by the U.S. Constitution, art. 1, § 4, cl. 1, Colorado has enacted the Uniform Election Code of 1992 ("Election Code"), articles 1 to 13 of title 1 of the Colorado Revised Statutes, as amended, which provides a robust framework for administering elections. Colorado statutes provide procedures for all aspects of running elections, including voter eligibility, voter registration, procedures for challenging an individual's right to register or to vote, procedures for reporting and prosecuting illegal voting, requirements for ensuring the security and safety of the election process, and requirements for ensuring that all ballots are handled, processed, tabulated, and stored securely. *See*, *e.g.*, Colo. Rev. Stat. §§ 1-2-101 (qualifications of electors); 1-2-201–205 (procedures for registration); 1-9-101–210 (procedures for challenges); 1-13-701–726 (election offenses); 1-2-204 (3)(a), 1-2-305 (2), 1-7-507 (7), 1-7.5-204 (3) (requiring election officials to forward evidence of violations of the Election Code to the district attorney); 1-5-616 (5)(a) (requiring election officials to establish security plans).

164. As the designated election official for Denver, the Clerk carries out these responsibilities for every election, and administering elections is one of the Clerk's core functions. The Clerk's office and the Denver Police Department also coordinate closely for each election to plan for and ensure a safe and secure election. The Denver Police Department provides a rapid response when necessary to respond to disturbances at the polls or to enforce election offenses.

165. The Election Code also allows for election watchers from each political party participating in the election and by unaffiliated watchers. §§ 1-7-105–107. Credentialed watchers have the right to witness and verify each step in the conduct of the election, maintain a list of eligible electors who have voted, challenge ineligible electors, and assist in the correction of discrepancies. § 1-7-108 (3).

166. Denver is home to a large immigrant population, with foreign-born residents making up roughly 14% of the population. These include roughly 41,000 residents born in Mexico, 4,000 born in Vietnam, and 3,000 born in Ethiopia, making it a likely target for ICE activity during the midterm election.[43]

167. Denver has already been a target for ICE activity. For example, on July 20, 2026, ICE agents stopped and detained Chantal Alejandra Morales Rojas, a 27-year-old Ecuadorian software developer and former au pair with a pending visa application at the Denver International Airport.[44]

168. In another high-profile incident in Denver, ICE detained a family of three, including a one-year-old baby, outside Denver Immigration Court after a scheduled immigration hearing.[45]

169. Denver will begin mailing ballots to all active registered voters no later than Monday, October 5, 2026. On that day, all 24-hour drop boxes will open to receive ballots.

170. The early voting period begins in Denver on October 12. Denver's main Voter Service and Polling Center (VSPC), located at Denver Central Library, opens on that day, with

---

[43] *B05006 - Place of Birth for the Foreign-Born Population in the United States (sorted by Denver County, Colorado)*, U.S. Census Bureau, https://perma.cc/Y7YS-6E2X (last accessed Sep. 10, 2026).

[44] Elizabeth Hernandez, *Woman detained by ICE at DIA files habeas petition challenging arrest*, The Denver Post (July 25, 2026), https://perma.cc/Y6GG-5HWF.

[45] Chase Woodruff, *Colorado advocates decry ICE courthouse arrest of immigrant family*, Colorado Newsline (May 30, 2025), https://perma.cc/N8U2-KBFK.

additional VSPCs opening between then and Election Day, November 3. On Election Day, all VSPCs will be open until 7:00 PM MST.

171. In the early voting period and on Election Day, election officials in Denver are responsible for setting up and operating VSPCs, checking in voters and issuing them ballots, managing all incoming mail ballots, collecting ballots from drop boxes, meticulously securing the ballot chain of custody, conducting voter outreach and support, and processing and counting ballots.

172. Election officials in Denver reasonably expect that the presence of armed federal law enforcement officers at election sites would disrupt these activities and intimidate voters and election workers. Under the state's Election Code, only election officials, credentialed election watchers, and voters are permitted within polling locations. *See* Colo. Rev. Stat. §§ 1-5-503,1-7-105–08, 1-7-115 (2026). In addition, the election security rules promulgated by the Colorado Secretary of State require the Clerk to restrict access to secure ballot areas and secure equipment areas. 8 Colo. Code Regs. § 1505-1:20.4 (2026). Any effort by federal agents to enter these areas would violate state law, breach election security requirements, create confusion and uncertainty for voters and election staff as to who has ultimate authority, and potentially disrupt the Clerk's ability to conduct the election. If federal agents gained unauthorized access to secure areas housing the City's voting and tabulation equipment, it could also cause a decertification of the City's election equipment under the Election Code and the Secretary of State's administrative rules. This would stop the Clerk from being able to use the equipment, compromising the Clerk's ability to timely process and tabulate ballots.

173. Roughly ninety percent of voters who cast a mail ballot in Denver return their ballot to one of the forty-eight 24-hour drop boxes throughout Denver. Teams of election judges and staff

are required by the Election Code to collect the ballots from the boxes; in the time immediately preceding the election the ballots must be collected daily. The presence of armed federal agents at the drop boxes may deter Denver voters from returning their ballots and may intimidate or disrupt election judges and staff from attempting to collect those ballots, impairing the Clerk's ability to collect ballots as required by Colorado law.

174. Election officials in Denver have had to prepare for the presence of armed federal agents at Denver election sites, and election officials have spent and continue to spend a significant amount of time, energy, and resources to prepare for the possible presence of armed federal agents, including coordinating response plans across multiple agencies, developing trainings, and developing contingencies for election administration.

175. The Clerk has already begun modifying training for election judges and educating staff on how to respond to the presence of federal agents. The Clerk has also begun conducting trainings for the first time for election judges and staff on how to deescalate interactions with federal agents, how to identify federal agents who may be in plain clothes, how to document the presence of federal agents, and when to request assistance related to the presence of federal agents. It is anticipated that approximately 80 to 85 judges will participate in that training alongside election staff during the month of October. Election officials will also have to develop contingency plans for voters at election sites in which federal activity is occurring, including plans for alternative polling locations. Election officials will also have to create a large-scale public messaging plan to rapidly communicate with voters in the event that federal agents appear at election sites or drop boxes.

176. Election officials in Denver reasonably expect that the presence of armed federal agents at VSPCs will deter, discourage, and intimidate poll workers. At a practical level, elections

in Denver are conducted in large part by hundreds of bipartisan election judges. Under the Election Code, election judges perform essential services, including conducting in person voting, processing ballots, conducting signature verification, tabulating ballots, assisting with voter registration, and collecting ballots from the 24-hour drop boxes. Colo. Rev. Stat. §§ 1-6-100.3 (defining "election judge"), 1-7-110–11 (in-person voting), 1-7-301–09 (processing and counting paper ballots), 1-7.5-107.3 (signature verification), 1-7-507 (electronic vote-counting), 1-2-217.7 (voter registration on or before Election Day), 1-7.5-107 (collecting ballots from drop boxes) (2026). Election judges are citizens who perform these essential duties on a temporary basis, and the Clerk struggles to recruit adequate numbers of judges for each election.

177. Already, Denver has heard from its own staff and from dozens of election judges that they are anxious and concerned about the possibility of federal agents with guns turning up to the polls for this election while they are on staff, and that they would like training and guidance about what to do if that happens. In the event armed agents do come to the polls, some election judges may no longer be willing to perform this work. Losing large numbers of election judges during the election cycle would impair the Clerk's ability to administer the election, impose significant costs to train replacement judges for that election, and hinder the ability to timely tabulate and report results. In particular, on Election Day, when the majority of Denver's in-person voters vote, the Clerk's ability to move voters through VSPCs efficiently, avoid long lines, and ensure every eligible voter in Denver has the opportunity to vote hinges on having adequate numbers of election judges.

178. Election officials in Denver reasonably expect that the presence of armed federal agents at polling locations or 24-hour drop boxes will deter, discourage, and intimidate voters. This may include voters opting not to go to the polls at all, leaving once they observe armed federal

officials without casting or dropping off their ballots, or declining to use Colorado's same-day voter registration process. During voter outreach efforts by the Clerk, voters have expressed overlapping concerns about mail ballot reliability and voting safely in person. Voters who have historically voted by mail have expressed concern about whether that option will remain open to them, prompting them to consider voting in person instead. But those same voters have expressed concern about armed federal agents at the polls and the fear that their presence could lead to disruption or violence. Together, these concerns have left voters confused and apprehensive about how to plan to cast their ballots.

179. The presence of armed officials at the polls likewise impedes local law enforcement. The Denver Police Department and the Clerk's office carefully coordinate election security and have a history of conducting peaceful, efficient elections. Should armed federal agents show up to polling sites, the City anticipates that their presence will disrupt Denver's established procedures for managing polling places and providing safe and secure voting. It could also divert officers from being able to respond to other security incidents in accordance with established protocols, potentially impede any law enforcement response to a disturbance or election offense by causing additional confusion or disturbance on site, and put officers in the difficult position of needing to deescalate unnecessary conflicts and determine how to respond to federal agents' activities.

**B. Hennepin County, Minnesota**

180. Plaintiff Hennepin County is responsible for administering federal, state, and local elections for the jurisdiction in tandem with local municipalities. *See generally* Minn. Stat. chs. 200–212.

181. Exercising the authority granted to states by the U.S. Constitution, art. 1, § 4, cl. 1, Minnesota has enacted statutes to provide a robust framework for administering elections.

Minnesota law prescribes procedures for all aspects of election administration, including voter eligibility and voter registration, Minn. Stat. ch. 201; procedures for challenging an individual's right to register or to vote, Minn. Stat. § 204C.12; procedures for reporting and prosecuting illegal voting, Minn. Stat. § 204C.14; requirements for ensuring the security and safety of the election process, Minn. Stat. § 211B.076; and requirements for ensuring that all ballots are handled, processed, tabulated, and stored securely, *see, e.g.,* Minn. Stat. §§ 204C.09, .13, .16, .19–.34.

182. Hennepin County works closely with each of the cities within its boundaries to administer elections. City staff operate early voting and Election Day polling locations in each city, while the County operates an early voting polling location at the Hennepin County Government Center open to all county voters. Hennepin County administers mail absentee voting for all cities within its boundaries except the City of Minneapolis, which administers its own mail absentee program. Hennepin County provides training, direction, and coordination of all election activities within its boundaries.

183. As the designated election official in Hennepin County, the Hennepin County Director of Elections, in conjunction with municipal clerks in Hennepin County, carries out these responsibilities for every election. Administering elections is the Director's core function. The Hennepin County Elections Department and municipal clerks coordinate closely with local law enforcement to plan for and ensure a safe and secure election. Local law enforcement provides a rapid response when necessary to respond to disturbances at polls or to enforce election laws.

184. Minnesota law does not authorize poll watchers. *See* Minn. Stat. § 204C.06 (limiting individuals who are allowed to be present in a polling location to voters, election officials, those wishing to register to vote or update registration, those conducting exit polling, representatives of the Secretary of State's office, the county auditor's office, and the municipal or

school district clerk's office, election judges, sergeant-at-arms, authorized challengers, teachers and elementary and secondary school students participating in authorized educational activities, or peace officers specifically summoned by an election judge to restore the peace or when those officers are themselves voting, updating registration, or registering to vote).

185. Hennepin County is home to a large immigrant population, with immigrants making up roughly 13% of the population.[46] Three in ten children in Hennepin County have at least one immigrant parent.[47] County officials are concerned that this demographic profile and the history of ICE activity in Hennepin County will make it a likely target for ICE activity during the Midterm Election.

186. Hennepin County—and in particular its largest city, Minneapolis—has already been a target for aggressive ICE activity. In December 2025, the federal government initiated "Operation Metro Surge," an unprecedented deployment of federal immigration enforcement agents from numerous agencies within the DHS to the State of Minnesota, including Minneapolis. During Operation Metro Surge, four thousand DHS agents—some of whom were armed and masked—conducted militarized raids and carried out immigration stops across the County, including at sensitive public places, like schools, courthouses, and hospitals in Minneapolis.

187. On January 7, 2026, a DHS agent shot and killed a Minneapolis resident, Renee Good. As a crowd gathered at the scene of the shooting, DHS agents deployed pepper spray at the crowd. The fatal shooting of Renee Good forced the lockdown of Green Central Elementary School, which was just a few blocks away.

---

[46] Vera Institute, *Profile of Immigrants in Hennepin County*, (July 2026), https://perma.cc/S679-YXM7.

[47] *Id.*

188. DHS actions impacted civic life far beyond a response to protests. On January 8 and 9, 2026, Minneapolis Public Schools cancelled school citywide due to safety concerns emanating from DHS agents' activity around Minneapolis. Other school districts similarly experienced closures due to ICE activity and preparations for e-learning, which many schools then offered as an option to students needing to shelter at home. An estimated 1,700 Minnesota children did not return to school following Operation Metro Surge.[48]

189. On January 14, 2026, as part of continued escalating violence, a DHS agent shot a Minnesota resident, Julio Cesar Sosa-Celis, through a doorway of a residential building in Minneapolis.

190. On January 24, 2026, CBP agents shot and killed a resident of Hennepin County, Alex Pretti, in Minneapolis. As a crowd grew at the scene of the shooting, DHS agents deployed chemical agents, flashbangs, and gas munitions. This was the third shooting by federal immigration agents in less than three weeks.

191. Hours after the shooting of Mr. Pretti in Minneapolis, Former Attorney General Pam Bondi sent Minnesota Governor Tim Walz a letter demanding, among other things, the state's voter rolls in return for the DOJ ending the "chaos" resulting from the deployment of armed federal immigration agents during Operation Metro Surge in the state.[49]

192. Operation Metro Surge required Hennepin County to find ways to support residents living in fear. The County created Operation Reconnect to direct affected businesses and families to relevant resources. The Hennepin County Board also passed a resolution stating it "reaffirms

---

[48] Becky Z. Dernbach and Cynthia Tu, *Kids literally disappeared': Minnesota schools lost at least 1,700 students following Operation Metro Surge*, MPR News (Sep. 1, 2026), https://perma.cc/ZWP2-AHN6

[49] *Read Bondi's Letter to Minnesota's Governor*, N.Y. Times (Jan. 24, 2026) https://perma.cc/EPK9-LKFV.

support for staff and community who are witnessing and experiencing the onslaught of federal agents in the County, and is committed to providing services, connection, and care for every resident, regardless of background, language, or circumstance with a person-centered and trauma-informed methodology."[50]

193. DHS agents' intimidating actions during Operation Metro Surge have left an indelible mark on the collective psyche and daily life of Hennepin County residents, regardless of their citizenship status or national origin. This conclusion is borne out by survey data on the effects of Operation Metro Surge, collected by the United States Immigration Policy Center (USIPC) at the University of California, San Diego. Of those surveyed in Minneapolis, 28.3 percent said "yes" to having at least one interaction with federal immigration enforcement agents during Operation Metro Surge; 63.4 percent said they missed work because their workplace closed due to Operation Metro Surge.[51]

194. Of those who had an interaction with federal immigration enforcement, 38.1 percent reported that federal immigration enforcement agents already had their weapons drawn when they approached them; 39.9 percent of those who had a reason to go to urgent care or the hospital said they were more likely to avoid seeking care than those who did not report an interaction; 52.6 percent said that their interaction with federal immigration enforcement happened at or near a school, healthcare facility, childcare facility, courthouse, or place of worship; and 57.1 percent said that they "strongly agree" or "somewhat agree" with the statement "I generally have

---

[50] Hennepin County, MN, Resolution No. 26-0034 R1 (2026), https://perma.cc/AGR8-XGM8.

[51] Tom K. Wong, *Large-Scale Immigration Enforcement and Its Consequences: The Impact of Operation Metro Surge*, U.S. Imm. Policy Center (Mar. 24, 2026), https://perma.cc/Z27Z-PN3K.

less trust in law enforcement now as a result of how [ICE] agents and Border Patrol (BP) agents have conducted federal immigration enforcement operations during Operation Metro Surge."[52]

195. Several key Hennepin County Elections department staff reported being afraid to physically report to work at the elections offices in downtown Minneapolis during Operation Metro Surge for fear of interaction with ICE agents, and these staff were shifted to working from home for the duration of the operation. During Operation Metro Surge, the Department of Justice also unlawfully used the tools of law enforcement as coercion, harassment, and retaliation against Hennepin County and other Minnesota officials. On January 20, 2026, it served a set of "extraordinarily broad" grand jury subpoenas on the Hennepin County Board of Commissioners and other Minnesota officials demanding a wide range of documents related to cooperation with federal immigration enforcement. Order 19, *In re Grand Jury Subpoenas*, No. 0:25-mc-00043-PJS (D. Minn. June 22, 2026), Dkt. No. 1. But it could point to no legitimate investigatory purpose for the subpoenas. *Id.* at 18 ("[T]he Department's asserted investigatory purpose for the challenged subpoenas is risible.'). Instead, in quashing the subpoenas, the federal district court agreed that "the subpoenas were issued as part of an unconstitutional effort to coerce Minnesota officials into assisting the federal government with enforcing civil immigration laws and to harass and retaliate against them for failing to do so." *Id.* at 14.

196. Hennepin County has reason to fear that the federal government will not follow the law. During Operation Metro Surge, the federal government ignored at least two hundred court orders.[53]

---

[52] *Id.*

[53] Emily Witt, *What Happened in Minneapolis*, The New Yorker (Aug. 31, 2026), https://perma.cc/T75C-9MV7; *see also Juan T.r. v. Noem*, No. 26-CV-0107 (PJS/DLM), 2026 WL 232015, at *1 (D. Minn. Jan. 28, 2026), *supplemented*, No. 26-CV-0107 (PJS/DLM), 2026

197. When federal judges objected to this "grave threat to the rule of law,"[54] the Department of Justice sought to punish them by bringing against them a "Complaint of Judicial Misconduct."[55]

198. As of October 7, 2026, DHS agents, including ICE agents, are still active in Hennepin County.

199. Early voting began on September 18 in Minnesota, the same day that the County began mailing absentee ballots to voters who had requested them and voters could begin requesting a vote by mail ballot or vote early in-person at select polling locations across the County. On Election Day, polls are open for in-person voting from 7:00 a.m. to 8:00 pm CST in the county.

200. In the early voting period and on Election Day, election officials in Hennepin County are responsible for fulfilling mailed absentee ballot requests from residents in cities other than Minneapolis, processing and counting returned mailed absentee ballots, processing voter registrations, sending registration notices to newly registered voters, performing pre-election and public accuracy testing on voting equipment and the results reporting system, operating a county-wide early in-person voting location at the Hennepin County Government Center, training and assisting city election clerks with polling places duties including training polling place election judges, and responding to disruptions or threats to the voting process. *See* Minn. Stat. §§ 203B.06 (establishing that county auditors or municipal clerks receive applications for and deliver absentee ballots to voters); 203B.121 (establishing that counties process and count returned mail absentee

---

WL 555601 (D. Minn. Feb. 26, 2026) ("ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence.").

[54] Mattathias Schwartz, *Trump's Minnesota Surge Threatened Democracy, Judge Warns*, N.Y. Times (Sep. 17, 2026), https://perma.cc/YYH8-83Z2.

[55] Complaint of Judicial Misconduct or Disability, U.S. Dept. Justice (Sep. 30, 2026), https://perma.cc/AA2Z-JR6Y.

ballots); 201.121, subd. 2 (establishing that counties send registration notices to newly registered voters); 206.83 (establishing that the official in charge of elections must test the systems before the election); 203B.081, subd. 1 (establishing that a county auditor's office can set up an early voting location at a polling place designated by the county auditor); 204B.16 (establishing that the governing bodies of municipalities designate polling places); 204B.181 (requiring counties to develop election emergency plans); 204B.25 (requiring counties to train election judges); 204C.19, .27–.29 (establishing county responsibility for reporting election results).

201. Election officials in Hennepin County reasonably expect the presence of armed federal law enforcement officers at election sites to disrupt these activities and intimidate voters and election workers. Minnesota law limits the individuals who are allowed to be present at an election site to a specific list of individuals that does not include federal law enforcement. *See* Minn. Stat. § 204C.06. Any effort by federal agents to enter any areas in which ballots are being counted or stored would thus violate Minnesota law, breach election security requirements, create confusion and uncertainty for voters and election staff as to who has ultimate authority, and potentially disrupt Hennepin County's ability to conduct the election alongside its municipal partners. If federal agents gained unauthorized access to secure areas housing the County's voting and tabulation equipment, it could also cause a decertification of the County's election equipment under Minnesota Administrative Rules. This could stop the deputy county auditors and municipal clerks from being able to use the equipment, compromising their ability to timely process and tabulate ballots.

202. Voters in Hennepin County typically vote in person. In 2024, eighty-seven percent of Hennepin County voters reported voting in person either before or on Election Day.[56] In addition, due to concerns about the reliability of the U.S. Postal Service this year, many of the voters in Hennepin County who received mail ballots are dropping their ballots off in-person at election sites. The presence of armed federal agents at these election sites—where voters are casting their ballots *and* dropping off mail ballots in large numbers—may deter Hennepin County voters from casting their ballots and may intimidate or disrupt election workers from assisting with that in-person voting, impairing election workers' ability to administer the election under Minnesota law.

203. Election officials in Hennepin County have spent and continue to spend a considerable amount of time, energy, and resources to prepare for the possible presence of armed federal agents, including by coordinating response plans across multiple agencies and jurisdictions, developing trainings, developing contingency plans for election administration, and responding to calls from concerned voters.

204. Already, Hennepin County has heard from its own staff and from dozens of election judges that they are anxious and concerned about the possibility of federal agents with guns turning up to the polls for the General Election while they are on staff. On three occasions in the last five months, federal investigators working for the Department of Homeland Security entered an elections space: once at a city elections office and twice at the early voting polling place at Government Center. Additionally, during Operation Metro Surge, there were at least two instances of ICE agents effecting arrests in the lobby of Hennepin County Government Center, very close to

[56] Hennepin County Elections, *Post-Election Voter Survey Report*, Hennepin County, MN (2024), https://perma.cc/5EFF-TLUL.

where the early voting polling place is located for the November 3, 2026 general election. Several elections staff members became distraught and anxious at work when they witnessed ICE agents affecting these arrests close to their work location. These staff members reported a reluctance to report to their work location and feelings of lack of safety at work following the incident. Some staff were assigned to alternate work locations during the remainder of the operation.

205. At the request of municipal clerks and election judges, Hennepin County has already had to develop new training resources and administer those trainings for its municipal clerks and election judges on how to respond to the presence of federal agents. Hennepin County elections staff have spent over 100 hours developing and delivering trainings and table top exercises for city elections staff, a significant portion of which addressed threats to elections security; the possibility of federal agents in or around polling places; civic protests near or in polling places that such a scenario could prompt; and city clerk and polling place election judge duties, responsibilities, and best practices for ensuring the safety and security of the voting process provided for in Minnesota Statute, such as de-escalation techniques, maintaining situational awareness, creating emergency plans in case of polling place evacuation and relocation, removing unauthorized individuals from polling places, maintaining the 100-foot buffer zone surrounding polling places, appointing sergeants-at-arms, requesting local law enforcement for peacekeeping, and communicating and coordinating with the county and state in emergency situations. Hundreds of municipal clerks have participated or are expected to participate in these trainings alongside County election staff. The time and energy that Hennepin County election staff have devoted to developing those resources and executing those trainings is time and energy that county election staff otherwise would have spent training city clerks and election judges on other aspects of the election administration process. This diversion of time and energy is particularly harmful in

Hennepin County because municipal election administrators across the county are hitting a retirement cliff, which means that Hennepin County must now train the newer, less experienced administrators who replaced the retired administrators on *both* federal interference issues *and* a vast universe of election administration duties under Minnesota law.

206. This year, in response to the threat of federal agents at polling locations, Hennepin County also had to develop an entirely new training module for the "head" election judges across the county to ensure that they are aware of and trained on how to respond to the presence of federal agents at election sites, covering similar topics to those covered with municipal clerks. These trainings have been or will be offered to the approximately 8,000 election judges who serve in Hennepin County on Election Day, including the approximately 500 head and co-head election judges who receive additional specialized training.

207. In addition, Hennepin County staff from a wide range of agencies have spent considerable time on emergency planning regarding the presence of federal agents at election sites. Indeed, since January 2026, dozens of county election workers and county attorneys have devoted hundreds of staff hours to planning for the presence of federal agents at election sites. Hennepin County has had to develop 8 contingency plans to prepare for the prospect of federal agents at election sites, constituting 38% of the county's risk mitigation plan for the upcoming midterm election. Hennepin County also added two new sections to the County's existing Election Emergency plan specifically addressing potential federal law enforcement presence in or around voting activity. These risk mitigation and emergency plans were developed in partnership with at least five other Hennepin County departments and divisions, including Emergency Management, Facilities Security, Hennepin County Attorney's Office, Communications, and IT, resulting in hundreds of hours of Hennepin County staff time outside of the Elections Department. Election

officials in Hennepin County reasonably expect that the presence of armed federal agents at election sites will deter, discourage, and intimidate election judges during the upcoming General Election. At a practical level, elections in the county are conducted in large part by hundreds of bipartisan election judges. Under Minnesota law, election judges are responsible for securing voter registration files, ballots, forms, and other required supplies for voting, Minn. Stat. § 204B.29; setting up polling places, *see* Minn. Stat. § 204B.18 (establishing requirements for polling booths and equipment); opening and closing the polling place, *see* Minn. Stat. § 204C.05, subd. 2(a); monitoring and overseeing conduct in and near polling locations, Minn. Stat. § 204C.06; preparing ballots for voting, Minn. Stat. § 204C.09; checking in voters, Minn. Stat. § 204C.10; instructing voters on how to mark ballots, 204C.13; monitoring the ballot counters, Minn. R. 8230.4365; and assisting with mail ballot procedures, Minn. Stat. § 204B.45, subd. 2).

208. During the Minnesota Primary Election in August 2026, election judges were *already* showing signs of discouragement after the Department of Justice sent "monitors" to Hennepin and Ramsey Counties.[57] Pursuant to Minnesota election law, Hennepin County denied these monitors entry to election sites, but allowed the monitors to remain outside of the 100-foot boundary around the election sites.[58] Some municipal clerks and election judges in Hennepin County reported that they did not want to serve in their role for the General Election after hearing that DOJ monitors may be present near election sites for the Primary Election.

209. In the event armed federal agents do come to the polls, some election judges may no longer be willing to perform this work. Losing large numbers of election judges during the

---

[57] U.S. Dep't of Justice, *Justice Department to Conduct Election Monitoring in Minnesota Primary Election*, Press Release (Aug. 11, 2026), https://perma.cc/97PB-VQAD.

[58] Hennepin County Attorney's Office, *Hennepin County Attorney's Office shares information on U.S. Department of Justice election monitor request*, Press Release (Aug. 10, 2026), https://perma.cc/24SM-RVGS.

election cycle—many of whom have served as election judges for many years and have developed expertise—would impair the county's ability to administer the election in tandem with its municipal partners, impose significant costs to train replacement judges for that election, and hinder the ability to timely tabulate and report results. In particular, on Election Day, when the majority of Hennepin County's in-person voters vote, the County's ability to move voters through the in-person voting process efficiently, avoid long lines, and ensure every eligible voter has the opportunity to vote hinges on having adequate numbers of election judges.

210. Election officials in Hennepin County reasonably expect that the presence of armed federal agents at polling locations will deter, discourage, and intimidate voters. On a roughly daily basis, Hennepin County's call center receives at least one call, if not more, from concerned voters and county residents regarding the county's plans to respond to the presence of federal agents at election sites. Callers ask questions about what plans Hennepin County Elections has in place to protect polling places from interference by federal agents, how the County would respond to federal presence in the county on Election Day, how the County can keep voters safe on Election Day from harassment or intimidation by federal agents both in polling places and on their way to vote, what voters can do to cast their ballot if they are afraid of potential federal interference at polling places, and what callers themselves can do to "protect" Hennepin County polling places and voters from federal interference. Together, these concerns have left voters confused and apprehensive about how to plan to cast their ballots. As a result of these concerns about the presence of federal agents at polling locations, voters may opt not to go to the polls at all, leave once they observe armed federal officials without casting or dropping off their ballots, or decline to use Minnesota's same-day voter registration process.

211. One of the local nonprofit organizations Hennepin County Elections contracts with to perform voter outreach and engagement reports that door-knock open rates have fallen since Operation Metro surge to 5-10% in 2026, compared to 40-45% in previous years. This same partner organization reports they have secured zero pledges to vote and only one voter registration, compared to prior years receiving hundreds of each. The organization works specifically with African immigrants.

212. The presence of armed officials at the polls likewise impedes local law enforcement. Should armed federal agents show up to polling sites, the County anticipates that their presence will disrupt the County's established procedures for managing polling places and providing safe and secure voting. Their presence could also divert local law enforcement officers from being able to respond to other security incidents in accordance with established protocols, potentially impede any law enforcement response to a disturbance or election offense by causing additional confusion or disturbance on site, and put officers in the difficult position of needing to deescalate unnecessary conflicts and determine how to respond to federal agents' activities.

## CLAIMS FOR RELIEF

### Count I
### Violation of the APA, 5 U.S.C. § 706(2)(A): Arbitrary and Capricious and Contrary to Law
*All Plaintiffs against all Defendants*

213. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

214. Both sets of defendants, DHS Defendants and DOJ Defendants, as confirmed through public statements, have each adopted their own versions of a new Polling Place Policy that authorizes armed federal officers, including ICE and FBI agents, to go to places where voters cast their ballots for the purpose of conducting routine civil immigration enforcement, customs enforcement, or civil law enforcement operations.

215. These Policies are not tentative: they have been announced with clarity by both DHS and DOJ Defendants. For DHS's part, ICE agents have acted pursuant to it on multiple occasions already. These twin policies definitively purport to determine the legal authority of ICE and FBI agents to go to polling places as necessary for routine immigration, customs, or civil law enforcement, which has legal consequence for voters as they head to the polls in the coming weeks and election officials as they prepare to and administer the election. Both the DOJ and DHS Polling Place Policies thus constitute final agency action within the meaning of 5 U.S.C. § 704.

216. Defendants failed to engage in a reasoned decisionmaking process before enacting and announcing their respective Polling Place Policies. Neither DHS nor DOJ Defendants sought feedback or public engagement, considered the likely effect of authorizing armed federal officers to go to places where elections are held, including the potential violation of state law, or explain their decisions.

217. Both Polling Place Policies conflict directly with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed officers at polling locations for any reason other than repelling armed enemies of the United States.

218. Moreover, they violate the Voting Rights Act because the threat of sending armed officers of the federal government to polling places intimidates people from attempting to vote in violation of 52 U.S.C. § 10307(b).

219. For these reasons, both the DHS and DOJ Polling Place Policies are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). They should, accordingly, be held unlawful and "set aside." *Id*. § 706(2).

**<u>Count II</u>**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(C):**
**In Excess of Statutory Authority or Limitation**
*All Plaintiffs against all Defendants*

220. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

221. Both the DHS and DOJ Polling Place Policies directly conflict with 18 U.S.C. § 592's express prohibition on ordering, bringing, keeping, or having under federal authority or control armed officers at polling locations for any reason other than repelling armed enemies of the United States.

222. The Policies thus exceeds the scope of Defendants' statutory authorization or limitations.

223. Defendants' authority to conduct enforcement operations, including serving warrants, detaining individuals suspected of being unlawfully present under federal immigration law, or conducting election integrity investigations, is limited by federal law, including 18 U.S.C. § 592.

224. Defendants' announcements of the Polling Place Policies make clear that they intend to authorize or direct armed federal officers, including but not limited to ICE and FBI agents, to conduct routine civil immigration or law enforcement, such as serving warrants, detaining individuals, or investigating fraud at polling places. That exceeds the clear limitation of 18 U.S.C. § 592 that armed individuals may only be permitted at polling places for the exclusive purpose of repelling armed enemies of the United States.

225. For that reason, each Polling Place Policy is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C). They should, accordingly, be held unlawful and "set aside." *Id.* § 706(2).

**<u>Count III</u>**
**Voting Rights Act Section 11(b), 52 U.S.C. § 10307(b)**
*Organizational Plaintiffs Against All Defendants*

226. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

227. Under the Polling Place Policies, Defendants have announced that armed federal immigration officers—visibly carrying firearms and vested with authority to stop, interrogate, detain, arrest, and initiate the removal of the people they encounter—will go to polling places while voters wait in line or cast their ballots, for the purpose of conducting routine immigration and law enforcement in violation of federal statute.

228. Defendants, by confirming the existence of the Polling Place Policies, have intimidated objectively reasonable voters, staff or volunteers of non-governmental organizations that urge or aid others to vote, local government election workers, and local government election volunteers under the totality of the circumstances. Threatening to send armed agents to polling places is intimidating to U.S. citizens who may be stopped or detained by ICE, including solely on the basis of their appearance or speaking Spanish, whether they themselves are trying to vote or whether they may be urging or assisting someone else to vote.

229. Defendants' threat is particularly intimidating to naturalized citizens, citizens in mixed-status families, citizens perceived to be foreign-born, and those who assist them at the polls, including election workers and volunteers, with the prospect of interrogation, detention, and family separation as the price of casting a ballot.

230. Moreover, Congress has categorically criminalized such conduct as an intrusion of armed federal force into the electoral process. The Polling Place Policies are thus intimidating within the meaning of Section 11(b) because it makes clear that Defendants are willing to disregard

federal law, and thus that they are willing to disregard the protections and rights secured to voters under federal statutes.

231. Defendants have already engaged in prohibited voter intimidation—regardless of what happens in the coming weeks. And Defendants will further intimidate voters if and when armed federal agents, including by not limited to ICE or FBI agents, in fact enter polling places.

232. The Polling Place Policies thus facially intimidate, threaten, and coerce individuals to abstain from voting, both because they evince a willingness to disregard federal law generally and because the presence of armed federal officers puts voters in fear that they will be confronted with interrogation or detention in the course of casting votes in the upcoming election, in violation of the Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b).

**Count IV**
**Declaratory Judgment Act – 18 U.S.C. § 592**
*All Plaintiffs against all Defendants*

233. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

234. Plaintiffs are entitled to declaratory relief on the basis of Counts I and II. There is a substantial and ongoing controversy between Plaintiffs and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that (1) Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592; and (2) any authorization of the deployment of armed federal officers to polling places under the Polling Place Policies is therefore unlawful and beyond Defendants' statutory authority.

**Count V**
**Declaratory Judgment Act – 52 U.S.C. § 10307(b)**
*Organizational Plaintiffs against all Defendants*

235. Plaintiffs assert and incorporate by reference the foregoing paragraphs.

236. Plaintiffs are entitled to declaratory relief on the basis of Count III. There is a substantial and ongoing controversy between Plaintiffs and the Defendants, and a declaration of rights under the Declaratory Judgment Act is both necessary and appropriate to establish that (1) authorizing the deployment of armed federal officers intimidates, threatens, or coerces reasonable individuals for voting or assisting someone else to vote, or for attempting to do so; and (2) any authorization of deployment of armed federal officers under the Polling Place Policies is therefore unlawful in violation of 52 U.S.C § 10307(b).

**Count VI**
**Ultra Vires – Contrary to 18 U.S.C. § 592**
*All Plaintiffs against all Defendants*

237. This Court has inherent equitable power to enjoin executive ultra vires conduct, and sovereign immunity is waived under 5 U.S.C. § 702 because such injunctive relief is non-monetary.

238. Neither the President nor any executive agency or its officials may take any action that exceeds the scope of their constitutional and/or statutory authority. An agency acts ultra vires when it plainly acts in excess of its delegated powers in violation of specific statutory prohibitions.

239. No statute, constitutional provision, or other source of law authorizes Defendants to adopt the Polling Place Policies and authorize armed agents to go to polling places; to the contrary, the policies are "entirely 'in excess of its delegated powers and contrary to [the] *specific prohibition*' in [18 U.S.C. § 592]." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citation omitted).

240. Defendants Polling Place Policies are thus ultra vires.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Declare unlawful, set aside, and enjoin the Polling Place Policies adopted by both DHS Defendants and DOJ Defendants;

2. Declare that Defendants lack lawful authority to order, bring, keep, or maintain armed officers at any place where a general or special election is held, because Congress has prohibited such conduct in 18 U.S.C. § 592;

3. Declare that the Polling Place Policies adopted by both DHS Defendants and DOJ Defendants violate Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b);

4. Enjoin Defendants, their inferior officers, and their employees from operating or carrying weapons in the vicinity of open polling places, including dropboxes, curbside voting locations, and similar places where votes are taken, collected, received, counted, or certified during early voting periods and on Election Day itself, for any reason other than repelling armed enemies of the United States;

5. Award costs and reasonable attorneys' fees incurred in this action; and

6. Grant such other relief as the Court may deem just and proper.

October 7, 2026

Respectfully submitted,

/s/ *Jennifer Holmes*

Jennifer A. Holmes (DC Bar No. 1018798)*
Toby Merrill (MA0006)**
Cassie Crawford (*pro hac vice*)†
Kyra Sikora (*pro hac vice*)
Graham Provost (DC Bar No. 1780222)‡

/s/ *Orlando Economos*

Orlando Economos (DC Bar No. 90013791)
Ronald A. Fein (DC Bar No. 90026641)
J.P. Cooney (DC Bar No. 494026)
Molly Gaston (DC Bar No. 90045824)
Kayla M. Kaufman (DC Bar No. 90029091)
Brian D. Netter (DC Bar No. 979362)

Public Rights Project
490 43rd Street, Unit 115
Oakland, CA 94609
(510) 738-6788

jennifer.holmes@publicrightsproject.org
toby.merrill@publicrightsproject.org
cassandra.crawford@publicrightsproject.org
kyra.sikora@publicrightsproject.org
graham.provost@publicrightsproject.org

*Counsel for City & County of Denver & Hennepin County*

Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

oeconomos@democracyforward.org
rfein@democracyforward.org
jpcooney@democracyforward.org
mgaston@democracyforward.org
kkaufman@democracyforward.org
bnetter@democracyforward.org

*Counsel for All Plaintiffs*

** Licensed in New York and Washington, D.C. Not licensed to practice law in California.*

***Licensed in Massachusetts and New York. Not licensed to practice law in California.*

*†Licensed in North Carolina. Not licensed to practice law in California.*

*‡Licensed in Washington, D.C. Not licensed to practice law in California.*